UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CM SYSTEMS, LLC<br><br>*Plaintiff*,<br><br>v.<br><br>TRANSACT TECHNOLOGIES, INC,<br><br>*Defendant*. | CASE NO. 3:22-cv-00624-JCH |

**PLAINTIFF'S OBJECTIONS TO THE MAY 10, 2023 ORDER GRANTING DEFENDANT'S MOTION FOR PROTECTIVE ORDER**

In the Court's May 10, 2023 Order, the Magistrate Judge clearly erred in granting a protective order preventing the deposition of Mr. John Dillon, Transact's CEO. Mr. Dillon possesses unique personal knowledge of the Accused Products and their role as the centerpiece of Transact's prospective business strategy and structural organization. Not only did CM Systems clearly demonstrate this in its briefing and argument on Transact' Motion for Protective Order (see Docs. 145, 147, & 152), but Mr. Dillon also admits to having such unique, personal knowledge himself in Transact's recent quarterly earnings call conducted on May 9, 2023. And yet, the Magistrate Court states that Plaintiff fails to demonstrate that Mr. Dillon—despite Plaintiff's evidentiary demonstration, Mr. Dillon's own admissions, and Transact's own disclosures—possesses unique personal knowledge of Transact's business restructuring centered around the allegedly infringing BOHA! system, and that Transact's other apex executives *might* otherwise be able to testify to these topics. *See* Doc. 153 at 2. The only alleged burden claimed by Transact relating to the deposition is nothing more than the usual burden of conducting a deposition. Therefore, the Magistrate's Order granting the protective order is clearly erroneous in light of these facts and warrants reversal.

I. **OBJECTIONS**

The Court's May 10, 2023 Order "is a discovery ruling…which is reviewable pursuant to the 'clearly erroneous' statutory standard of review." Doc. 153, p.4 (citing 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); and D. Conn. L. R. 72.2). Accordingly, CM Systems hereby makes of record its objections to the Order.

In the Order, the Magistrate Court states the applicable standard for depositions of "apex" executives as follows:

> A court applying Rule 26(c) may prohibit a party from deposing senior corporate executives where the party [either (i)] has not established that the executive has some unique knowledge pertinent to the issues in the case or [(ii)] where the party can obtain the desired information through less intrusive means.

Doc. 153, ECF p.2 (punctuation omitted) (citing *Weber v. Fujifilm Med. Sys. U.S.A.*, No. 3:10-CV-401-JBA, 2011 U.S. Dist. LEXIS 6197, at *2 (D. Conn. Jan 24, 2011).

However, there is "no *per se* rule barring depositions of top corporate executives." *Rodriguez v. SLM Corp.*, No. 3:07CV1866 (WWE), 2010 U.S. Dist. LEXIS 29344, at *5 (D. Conn. Mar. 26, 2010). And the narrow circumstances under which the Court is permitted to restrict such depositions simply do not exist here.

In fact, the *Weber* case—the very case for which the Magistrate Court relies for this standard of preventing the deposition of "apex" executives from partaking—is not only representative of a scenario where this Court ***allowed for*** the depositions of such executives but is on point to CM Systems' request to depose Mr. Dillon as to his demonstrated knowledge of the products at issue in this litigation, including the circumstances of their sale.

As detailed *infra*, because Mr. Dillon has at least "some unique knowledge" to the facts of the underlying claim—knowledge that CM Systems "can[not] obtain…elsewhere"—CM Systems "is [therefore] entitled to [his] deposition." *Weber*, 2011 U.S. Dist. LEXIS 6197, at *8–10.

In granting the motion for protective order, the Court provides three reasons for its decision: (1) that Plaintiff allegedly "has been unable to identify with specificity any information or knowledge that Mr. Dillon has gleaned in the short period following his appointment to CEO that provides Mr. Dillon with some unique knowledge of the current litigation," Doc. 153, p.2; (2) that "TransAct has identified three apex level executives that CM Systems is planning on deposing during the next several days who supposedly have greater knowledge of the topics at issue than Mr. Dillon," *id.*, p.3; and (3) "the time and financial burden of a deposition on Mr. Dillon," *id.*, p.4. As set forth herein, none of these three reasons justifies the granting of a protective order.

### A. EVIDENCE DEMONSTRATES THAT JOHN DILLON HAS UNIQUE, PERSONAL KNOWLEDGE OF THE ACCUSED PRODUCT SUBJECT TO THESE PROCEEDINGS

Simply asserting that an executive "did not engage in any day-to-day management of [their] company or have personal involvement with its products" or that they "[did] not have personal or unique knowledge relevant to this action" alone cannot shield such apex executives from being deposed—such a thinly-veiled defense crumbled for the executives in *Weber* as it should for Mr. Dillon. Doc. 145-4, ¶¶ 3–4

In *Weber*, both executives claimed—as did Mr. Dillon here—that they had "no direct involvement in the day-to-day operations of" the defendant company. *Weber*, 2011 U.S. Dist. LEXIS 6197, at *3–4. And yet, the *Weber* Court (as should this Court) rejected these assertions because the plaintiff "established [through the presentation of evidence] that [the executives] appear to have *some* unique knowledge pertinent to" the underlying case. *Id.* at *8. Such evidence—which included without limitation "deposition testimony," a memorandum written by one of the executives, and the executive's own statements—illustrated that the executives had both "some unique knowledge" of the termination underlying the case and knowledge of "the leadership of…[the] Corporation as a whole," therefore warranting their deposition. *Id.* ("[The executives]

3

therefore have unique knowledge about the nature and extent of their own involvement, and that of the leadership of FujiFilm Corporation as a whole, in the process that led to Weber's termination from FMSU.").

Here, CM Systems presented evidence directly contradicting Mr. Dillon's claimed lack of knowledge. As detailed in a May 2, 2023 Transact press release, Mr. Dillon details his knowledge of the specific use and functionality of the accused BOHA! products and his understanding of Transact's purpose for the BOHA! systems within its Food Service Technology business:

> "Operators across every Food Service market have been challenged with understaffing, high turnover, and rising food and labor costs. We wanted our next-generation BOHA! Terminal to get to the heart of helping restaurant, convenience store and supermarket back-of-house operations teams ensure their staff has the very best solution to automate food safety and FDA labeling compliance, all while increasing productivity," said **John Dillon**, Interim CEO of TransAct Technologies.

Doc. 147-1. Additionally, the day before the Magistrate Court's May 10, 2023 hearing on this matter, Transact hosted its public earnings call with shareholders and investors. *See* Declaration of Paul Joseph Spina IV ("Spina Declaration") ¶ 2. Mr. Dillon detailed his personal outlook of the current state of Transact and his vision and philosophy for increasing the BOHA! systems' market presence within the food service market—a market also occupied by CM Systems—as follows:

> Before becoming the CEO here [at Transact] I've been on the board about a decade so **I know something about the company.**
> \*\*\*
> First of all, I feel confident that stating that Transact has a great number of strengths and some fundamental goodness for a company of our size, and we are not big.
> \*\*\*
> The BOHA! Platform is differentiated. It is a well-designed product and with our recent launch of the BOHA! Terminal 2 **I think** the product strength only improves. And frankly the need for technology solutions in the back of the house where operational challenges are only increasing—companies in the food service industry are dealing with food wastage, spillage, labor, and costs every day, and I believe there is the challenge of the FDA-approved labeling—only continue to grow every day. And frankly **I think** Transact's ability to be the product that wins that market is real. **I also believe** that adjustments to our product positioning and sales strategies

> will result in positive changes that help customers and prospects see our BOHA! platform and **I believe** in the end we can gain widespread adoption of these terminals in the food service establishments that we serve. In a short time since I have been the CEO, **I have had an opportunity** to move quickly to enact some…changes, implement it relative to sales motion and go-to-market strategy, and **I believe** that this is an iterate process. These things aren't things that will have a massive impact immediately but **I believe** that we all-in-all can improve the…go to market strategy relative to FST, Food Safety Technology, Food Service Technology, and that we can increase the number of new terminals we sell, and **I believe** that we should treat that as the most important indicator where we have success and traction for BOHA! **I am already making moves to prioritize this objective.**
>
> ***
>
> As previously mentioned, the new terminal growth remains the most important element of the FST business. **I intend** to focus on that metric. And while we are encouraged by the 553 new terminals we added in the quarter, we are making, as I mentioned, already changes to our sales strategy to enhance the quarterly run rate. The changes will take some time, it is all iterative as I already mentioned, and I will provide more detail around what we are doing in the coming quarters and what we expect to yield from the efforts.
>
> ***
>
> We got a pretty good relationship with the number of clients that want a terminal that does X and Y and Z and we have been listening to them. This new Terminal 2 is sort of like all of the enhancements that we would have wanted to make, the screen is better, the printer is faster, the power supply is built in. The screen is – you can get it two ways, you can get it with a tablet that you can walk around with and detach – but this screen and its bezel are built in. And you kind of put all of it together and it is just all the way around a better terminal, its faster, its more performant, the screen is brighter, I mean it is sort of a whole bunch of those things all combined. **And I have taken a close look at it.**

Spina Declaration ¶ ¶ 3–4 (citing *TransAct Technologies First Quarter 2023 Earnings Conference Call*, TRANSACT TECHNOLOGIES INC. (May 9, 2023), 1:58–8:26 and 21:07–21:58 (available at https://viavid.webcasts.com/starthere.jsp?ei=1608661&tp_key=dd5675ee54) (emphasis added).

This is precisely the subject matter about which CM Systems seeks to depose Mr. Dillon—that is, ***his*** unique, personal knowledge and perspective as to ***his*** strategy and vision to ensure Transact's "transformation" into a company structured (*i.e.*, "operated and managed") around the infringing BOHA! products is both successful, sustainable, and profitable. Mr. Dillon is willing to openly discuss this same information with his shareholders, investors, and the general public, so

5

CM Systems should be permitted to depose Mr. Dillon on these same issues, which are relevant to this case.

It is also difficult to reconcile Mr. Dillon's assertion that he does "not have personal or unique knowledge relevant to this action" (Doc. 145-4, ECF p. 2 ⁋ 3) when just six days later he publicly details (i) his knowledge and familiarity with Transact developed from his decade-long service as a board member, (ii) his understanding of the capability of the infringing BOHA! products in assisting customers "back of house operations" such as combating food spoilage (and, therefore, temperature management), (iii) his personal, unique goals for the potential growth of Transact founded and "focus[ed]" on the sales of the infringing BOHA! terminal, and (iv) changes to Transact's business he has personally implemented since becoming CEO to achieve these goals and further plans to introduce.

CM Systems discussed each of these statements by Mr. Dillon during the hearing on this matter. Transcript of May 10, 2023 Hearing, 5:6-11, 7:3-9, and 12:5-10. Yet the Court's Order states that CM Systems was "unable to identify with specificity any information or knowledge that…that provides Mr. Dillon with some unique knowledge of the current litigation." Doc. 154, ECF p.3. This conclusion is clearly erroneous, especially when, as did the executives' knowledge of the employment termination underlying the *Weber* case, Mr. Dillon *himself* has outlined his personal, unique knowledge as to the Accused Product underlying this litigation.

Without personal, unique knowledge as to the BOHA! products at issue in this litigation, Mr. Dillon would be unable to, as he states, "mak[e] moves to prioritize" Transact's objective "to increase the number of new terminals [Transact infringingly] sell[s]." Mr. Dillon, too, cannot shift Transact's "focus" to emphasize the growth of its BOHA! terminals without a clear understanding

of both the infringing product and the market it serves—the food service technology market, which Mr. Dillon also speaks at length about.

Mr. Dillon possess unique knowledge and perspective of Transact, its business strategy and vision, its restructuring around the infringing BOHA! system, and the food service technology market—a knowledge and perspective that, by Transact's detailed limitations, no other person affiliated with Transact possesses, that set Mr. Dillon apart from his colleagues and co-workers, and that led to his appointment as CEO of Transact. Accordingly, the Court's Order is clearly erroneous that Plaintiff "has been unable to identify with specificity any information or knowledge that Mr. Dillon has gleaned in the short period following his appointment to CEO that provides Mr. Dillon with some unique knowledge of the current litigation." Doc. 153, p.2.

### B. THE "BURDEN" CLAIMED BY TRANSACT IS SOLELY PREDICATED ON MR. DILLON'S CLAIMED LACK OF KNOWLEDGE

During oral argument, the Court conceded that there was no articulation of any alleged burden on Transact in permitting the deposition of Mr. Dillon: "But on that last point, I agree with you that there hasn't really been an articulation of the alleged undue burden. I assume the alleged undue burden Attorney Park argues in his brief is that he claims that Mr. Dillon doesn't have any unique knowledge." Transcript, 14:10–14. In response, counsel for Transact merely argued that the "burden" was Mr. Dillon's alleged lack of knowledge that constituted the burden: "

> I will just add, at this point, we do allege that there would be burden for Mr. Dillon to be deposed on—I believe it is discussed in page 4 of our memorandum for the motion, where we explain expressly that deposing Mr. Dillon, who doesn't have unique personal knowledge, would be a waste of the party's resources and time, and unnecessary.

*Id.*, 14:21–15:2. Beyond that, Transact claims no burden other than the standard time and expense of conducting a deposition. *Id.*, 15:3–10.

7

As set forth in detail, *supra*, CM Systems has demonstrated that Mr. Dillon possess more than enough unique, individual knowledge to justify his deposition. Indeed, Mr. Dillon almost certainly knows more than CM Systems has been able to determine from his public statements. To allow Transact to turn discovery on its heads by essentially requiring CM Systems to outline the full scope of a witness's potential testimony, turns the calculus of "burden" on its head. Therefore, the Court clearly erred in granting a protective order on the basis of "the time and financial burden of a deposition on Mr. Dillon." Doc. 153, p.4. For the foregoing reasons, the Court's Order should be reversed and the deposition of Mr. Dillon permitted to proceed.

Respectfully submitted,

/s/ N. Andrew Crain

Aaron D. Rosenberg (ct29518)
SHEEHAN PHINNEY BASS & GREEN, PA
28 State Street, 22nd Floor
Boston, MA 02109
(617) 897-5600
arosenberg@sheehan.com

N. Andrew Crain (admitted *pro hac vice*)
Charles Landrum (admitted *pro hac vice*)
Paul J. Spina IV (admitted *pro hac vice)*
THOMAS | HORSTEMEYER LLP
3200 Windy Hill Rd SE
Suite 1600E
Atlanta, Georgia 30339
T: 770.933.9500
F: 770.951.0933
a.crain@thip.law
c.landrum@thip.law
p.spina@thip.law

*Counsel for Plaintiff,*
*CM Systems LLC*

Dated: May 24, 2023

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CM SYSTEMS, LLC<br><br>*Plaintiff*,<br><br>v.<br><br>TRANSACT TECHNOLOGIES, INC,<br><br>*Defendant*. | CASE NO. 3:22-cv-00624-JCH |

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed electronically today via the Court's CM/ECF Electronic Filing System. A Notice of Electronic Filing will be sent by e-mail to all parties via operation of the Court's CM/ECF Electronic Filing System or by mail to anyone unable to accept electronic filing as indicated on the Notice. Parties may access this filing through the Court's CM/ECF System.

/s/ N. Andrew Crain
N. Andrew Crain

Dated: May 24, 2023