**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CM SYSTEMS, LLC, | : | |
| Plaintiff, | : | CIVIL CASE NO. |
| | : | 3:22-CV-00624 (JCH) |
| v. | : | |
| | : | |
| TRANSACT TECHNOLOGIES, INC., | : | |
| Defendant. | : | FEBRUARY 15, 2024 |

**RULING ON CLAIM CONSTRUCTION**

## I.    INTRODUCTION

Plaintiff CM Systems, LLC ("CM") brings this action against defendant TransAct Technologies, Inc. ("TransAct") under section 271 of title 35 of the United States Code. See Supplemented Complaint ("Suppl. Compl.") (Doc. No. 53).  CM asserts that TransAct's has infringed CM's Patent Nos. 9,811,788 (hereinafter "the '788 Patent"), 11,004,020 (hereinafter "the '020 Patent"), and 11,449,810 (hereinafter "the '810 Patent").  Id.  In response, TransAct seeks a declaration of noninfringement as to each asserted Patent, and it further contends that each asserted Patent is invalid.  See Answer, Affirmative Defenses, and Counterclaims ("Answer") (Doc. No. 56).

The parties have both filed claim construction briefing, see CM's Opening Brief on Claim Construction ("Pl.'s CC Br.") (Doc. No. 124); TransAct's Opening Claim Construction Brief ("Def.'s CC Br.") (Doc. No. 125), which this court now addresses.

## II.    BACKGROUND

### A.    Factual Background

CM asserts that TransAct has infringed three of its Patents: the '788 Patent, the '020 Patent, and the '810 Patent.  See Suppl. Compl.  Each of these three Patents

1

(hereinafter "the Asserted Patents") are titled "Food Safety Management System", and they each claim technological components that comprise various embodiments of a system for monitoring and managing food safety.  See '788 Patent, Pl.'s Ex. B (Doc. No. 124-2); '020 Patent, Pl.'s Ex. C (Doc. No. 124-3); '810 Patent, Pl.'s Ex. D (Doc. No. 124-4).  Specifically, the Asserted Patents describe, inter alia, a system that includes: a handheld computing device that displays a checklist of various tasks to be performed in a food service establishment; handheld temperature sensors; stationary sensors; and a server that runs an application for management and reporting.  See '788 Patent; '020 Patent; '810 Patent.

The final '788 Patent was issued on November 7, 2017.  See '788 Patent.  The '020 Patent, a continuation-in-part of the '788 Patent, was issued on May 11, 2021.  See '020 Patent.  The '810 Patent, a continuation of the '020 Patent and a continuation-in-part of the '788 Patent, was issued on September 20, 2022.  See '810 Patent.

The parties disclosed twelve terms, found throughout the Claims in all three Patents, of which they seek this court's construction.  See Joint Disputed Claim Terms Chart ("Claims Chart") (Doc. No. 75-1).

B.    Procedural Background

On May 3, 2022, CM filed its initial Complaint in this action.  See Complaint (Doc. No. 1).  CM filed a Supplemented Complaint on October 18, 2022.  See Suppl. Compl. On November 1, 2022, TransAct filed its Answer to CM's Supplemented Complaint, along with its affirmative defenses and multiple counterclaims seeking a declaration of noninfringement as to each of the Asserted Patents.  See Answer.  TransAct filed its first Motion for Summary Judgment on November 21, 2022, see TransAct's Motion for

Summary Judgment of Non-Infringement ("Def.'s Prior Mot.") (Doc. No. 66), which the court subsequently terminated, without prejudice, to allow TransAct to file a new Motion for Summary Judgment.  <u>See</u> Order (Doc. No. 198).

On April 10, 2023, the parties filed their claim construction briefs.  <u>See</u> Pl.'s CC Br.; Def.'s CC Br.  The parties submitted their Reply Briefs on May 10, 2023.  <u>See</u> TransAct's Reply Claim Construction Brief ("Def.'s CC Reply") (Doc. No. 154); CM's Reply Claim Construction Brief ("Pl.'s CC Reply") (Doc. No. 155).

## III.    LEGAL STANDARD

A suit claiming patent infringement proceeds in two steps: first, the presiding court must construe the claims at issue in the case and, second, the finder of fact must compare the patented process or device, as described in the construed claims, against the accused device or process to determine whether the accused device or process actually infringes.  <u>Cybor Corp v. FAS Techs., Inc.</u>, 138 F.3d 1448, 1454 (Fed. Cir. 1998), <u>abrogated on other grounds by</u> <u>Phil-Insul Corp. v. Airlite Plastics Co.</u>, 854 F.3d 1344 (Fed. Cir. 2017).  The first step, claim construction, is vitally important because it is the claims that define precisely what it is that the inventor created.  <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312 (Fed. Cir. 2005).  The question of what the claims mean is a question of law and, as such, is exclusively determined by the court.  <u>Markman v. Westview Instruments. Inc.</u>, 52 F.3d 967, 977-79 (Fed. Cir. 1995), <u>aff'd</u>, 517 U.S. 370 (1996).  "Although the claims are construed objectively and without reference to the accused device, only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy."  <u>Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.</u>, 200 F.3d 795, 803 (Fed. Cir. 1999).

The specific words of the claim "should ordinarily be given their ordinary and customary meaning."  3M Innovative Props. Co. v. Tredegar Corp., 725 F.3d 1315, 1321 (Fed. Cir. 2013).  The Federal Circuit has clarified that the ordinary and customary meaning is the meaning that a person having ordinary skill in the art in question at the time of the invention would give those words.  Id.  Importantly, the person having ordinary skill is not reading the claims in a vacuum; instead, they read the claims with an eye to the entire patent, including the specification.  Id.  When the disputed claim language involves words that can be readily understood even by lay judges, claim construction "involves little more than the application of widely accepted meaning of commonly understood words."  Phillips, 415 F.3d at 1314.  In that case, the court may turn to a general purpose dictionary for guidance as to the ordinary and customary meaning.  Id.

Although the court strives to give the claims their ordinary and customary meaning, "[i]diosyncratic language, highly technical terms, or terms coined by the inventor are best understood by reference to the specification."  Id.  Nevertheless, "courts must take care not to import limitations into the claims from the specification." Abbott Labs v. Sandoz, Inc., 566 F.3d 1282, 1288 (Fed. Cir. 2009).  Another intrinsic source that the court should look to for how to understand the meaning of disputed terms is the record contained within the prosecution history.  Phillips, 415 F.3d at 1314-15.  However, the prosecution history should not be utilized to narrow the meaning of a claim unless the patentee intentionally limited or surrendered the scope of the claims "through a clear and unmistakable disavowal."  3M Innovative Props., 725 F.3d at 1321.

Finally, district courts are not bound to construe every claim just because the parties request it.  See Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1207 (Fed. Cir. 2010) (affirming the district court's decision to not provide additional construction when that decision resolved the dispute over the terms).  The court cannot shirk its responsibility to construe claims where the plain and ordinary meaning would allow the parties to reargue construction to the jury.  02 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1361 (Fed. Cir. 2008).  However, where the court's adoption of the plain and ordinary meaning resolves the dispute between the parties, it is permissible for the court to choose to not give those terms any further construction.  Summit 6, LLC v. Samsung Elecs. Co., Ltd., 802 F.3d 1283, 1291 (Fed. Cir. 2015).

## IV.    DISCUSSION

The parties dispute the meaning of twelve claim terms, see Claims Chart, each of which the court analyzes below.

### A.    Claim Term One: The Term "Computing Device" Requires No Further Construction

The term "computing device" can be found throughout the Asserted Claims of all three Patents.  Specifically, the term appears in Claims 1, 3, 5, 6, and 19 of the '788 Patent; Claims 1, 3, 4, 5, 6, 11, 12, 13, 14, 15, 18, 19, and 20 of the '020 Patent; and Claims 1, 3, 4, 5, 6, 11, 12, 13, 14, 15, 18, 19, and 20 of the '810 Patent.  See Claims Chart at 1; '788 Patent; '020 Patent; '810 Patent.  CM argues that the term should be construed to mean "a device comprising a processor and a memory."  See Pl.'s CC Br. at 5-7.  TransAct contends that no construction is needed for the term, but, if the court

determines construction is necessary, it should construe the term to mean "server". See Def.'s CC Br. at 7-9.

The court finds that both parties' positions have relative merit. However, because the court finds that "the plain and ordinary meaning of the disputed claim language is clear", the court declines to proffer a construction. See Summit 6, 802 F.3d at 1291; accord 02 Micro Int'l Ltd., 521 F.3d at 1362 (noting that "district courts are not (and should not be) required to construe every limitation present in a patent's asserted claims"). Moreover, the court agrees with TransAct[1] that construing the term "computing device" to mean "a device comprising a processor and a memory" would risk rendering the additional language "at least one computing device comprising a processor and a memory" superfluous. See Stumbo v. Eastman Outdoors, Inc., 508 F.3d 1358, 1362 (Fed. Cir. 2007) (noting that the Federal Circuit generally disapproves of claim constructions that renders Claim language "superfluous"); accord Merck & Co. v. Teva Pharms. USA, Inc., 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

The court notes, however, that it agrees with CM that TransAct's proposed, alternative construction—"server"—is too limiting. While a server may constitute a type of "computing device", there is no evidence that the Claims intended to cabin the term to mean only "server", and the court should generally avoid limiting a claim term based on one specific embodiment described in a Patent's specification. See Phillips, 415 F.3d at

---

[1] After preliminarily adopting CM's proposed construction, the court was persuaded at the Markman hearing by TransAct's contention that the construction would render the Claim language duplicative.

1323 (stating that, "although the specification often describes very specific embodiments of the invention", courts generally should not "confin[e] the claims to those embodiments").

The court therefore finds that the term "computing device" has an ordinary meaning that requires no further elaboration, and it therefore declines to provide additional construction.

      B.    <u>Claim Term Two: The Term "Application Causes" Requires No Further Construction</u>

The term "application causes" is used in Claim 1 of the '788 Patent; Claims 1, 10, and 17 of the '020 Patent; and Claims 10 and 17 of the '810 Patent.  <u>See</u> Claims Chart at 2.  CM originally asked that the court construe this term to mean "application makes happen", <u>see</u> Pl.'s CC Br. at 7-9, whereas TransAct contended that the term need not be construed because the plain and ordinary meaning of the term is clear, <u>see</u> Def.'s CC Br. at 9.  At the <u>Markman</u> hearing, the parties agreed to the court's then-preliminary determination that "application causes" requires no further construction.  Nonetheless, the court briefly articulates its rationale for concluding that the term requires no construction.

The court agrees with TransAct that this term does not require further construction because its plain and ordinary meaning is clear.  CM's initial proposed construction of "application makes happen", in the court's view, is unnecessary and does not cohere with the relevant Claim language.  Claim 1 of the '788 Patent and Claim 1 of the '020 Patent recite how the "application causes the at least one computing device" to perform various tasks—<u>i.e.</u>, the application causes <u>another device</u> to do something.  <u>See</u> '788 Patent at 18:39-18:42; '020 Patent at 19:48-19:51.  Thus, as the

7

defendant argues, construing the term to mean "application <u>makes happen</u>" would not make sense within the context of the specific Claim language.

The court also notes that much of the argumentation in CM's briefing regarding this term relates to a section of TransAct's prior Motion for Summary Judgment, <u>see</u> Def.'s Prior Mot., which has since been terminated, <u>see</u> Order (Doc. No. 198).  In that Motion, TransAct asserted that (1) the language in the '788 Patent stating that the "web portal application '<u>causes</u> the . . . computing device to . . . send [a] checklist to [a] handheld computing device'" "clearly claims <u>push</u> technology", <u>see</u> Memorandum in Support of Motion for Summary Judgment of Non-Infringement at 15 (Doc. No. 66) (emphasis in original) (quoting '788 Patent at 18:51-18:52); and (2) the Claim language in the '788 Patent stating that "the web portal application '<u>causes</u>' the server to . . . 'obtain a plurality of responses to [a] checklist from [a] handheld computing device'" "clearly claims <u>pull</u> technology", <u>see id.</u> at 16 (emphasis in original) (quoting '788 Patent at 18:54-18:56).  Notably, however, TransAct's claim construction briefing no longer advances this argument, as TransAct explicitly notes in its claim construction materials. <u>See</u> Def.'s CC Reply at 3 ("Defendant does not rely on any 'push' or 'pull' language in its Opening Brief . . . .").  Indeed, at the <u>Markman</u> hearing, TransAct confirmed that it is not advancing this argument.  Moreover, it appears to the court that any analysis of the issue of "push" versus "pull" technology is rooted in the distinction between the terms "send" and "obtain" and is thus more appropriately addressed when discussing those terms, rather than the term "application causes".[2]

---

[2] As noted below, the court agrees with CM that, based on the intrinsic evidence, limiting either claim term to solely encompass "push" or "pull" technology would not be appropriate.  <u>See</u> Section IV.E, <u>infra</u>.

In sum, the court finds that the plain and ordinary meaning of "application causes" is clear on its face, and the court will not provide further construction of this term.

C.    <u>Claim Term Three: The Term "Management Portal Application" Should Be Construed to Mean "Portal Application that Provides an Interface for Management Users to Manage Checklists"</u>

The term "management portal application" is found in Claims 1, 4, 5, 9, 10, 14, 15, and 17 of the '020 Patent, as well as Claims 9, 10, and 17 of the '810 Patent. <u>See</u> Claims Chart at 3. CM argues that this court should construe the term to mean an "application that provides an interface for managing data". <u>See</u> Pl.'s CC Br. at 9-11. TransAct asserts that the term need not be construed, but nonetheless proposes that this court construe the term to mean "web portal application". <u>See</u> Def.'s CC Br. at 9-10.

The court finds neither party's proposed construction to be satisfactory, and will instead adopt the term, "portal application that provides an interface for management users to manage checklists."[3] As both parties note, although the specification in the '020 Patent does not precisely define or describe the term "management portal application", the Patent does describe a "corporate management portal" that is, "[i]n some embodiments . . . the same application as the web portal application but with behavior specific to corporate management users . . . ." '020 Patent at 8:5-8:11. The Patent further states, however, that, "[i]n other embodiments, the corporate

---

[3] At the <u>Markman</u> hearing, the court offered a preliminary construction of "an application that provides an interface for management users to manage checklists." The court was ultimately persuaded however, by the defendant's contention that the construction would risk reading the word "portal" out of the Claim term. <u>Merck</u>, 395 F.3d at 1372 ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."). The court concludes that "portal application that provides an interface for management users to manage checklists" is the proper construction.

management portal includes an entirely separate application executed on different servers." Id. at 8:11-8:15; see also '810 Patent at 8:14-8:21 (same). The specifications thus make clear that the management portal application can be distinct from the "web portal application". As such, TransAct's proposed construction does not appear to be fully accurate.

However, the court also cannot accept CM's proposed construction of "an application that provides an interface for managing data". The court notes that "[t]he starting point for determining the meaning of a disputed claims begins with the claims themselves." Chapco, Inc. v. Woodway USA, Inc., No. 15-CV-1665, 2016 WL 7168375, at *4 (D. Conn. Dec. 8, 2016) (citing SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331, 1338-39 (Fed. Cir. 2005)). Notably, "management portal application" is a somewhat idiosyncratic term without a plain and ordinary meaning; as such, the court refers to the Claim language and specifications of the Patents to glean the correct meaning. See Phillips, 415 F.3d at 1314 (noting that more idiosyncratic terms "are best understood by reference to the specification", rather than their plain and ordinary meaning). Independent Claim 1 of the '020 Patent recites how the "management portal application", "when executed . . . causes the at least one computing device to identify a management user and receive from the management user through the management portal application a customization to a master checklist . . . ." '020 Patent at 19:48-19:55. Moreover, the specifications in both the '020 and '810 Patents refer to both "corporate management portals" and "regional management portals". The "corporate management portals" allow a "corporate management user" to "configure checklists for all of the food service establishments across a chain or grouping". '020 Patent at 8:16-

10

8:19; '810 Patent at 8:22-8:24.  The regional management portals "enable a regional management user to further configure the master checklists for one or more food service establishments."  '020 Patent at 8:39-8:41; '810 Patent at 8:45-8:47.  Given the overall context of the Patents, the word "management" is used, in this term, to refer to the fact that the application is designed specifically for use by a management-level user, either at the corporate or regional level.

It is also apparent that the "management portal application" is meant to manage checklists.  The Claim language in the '020 Patent recites how the management portal application "causes the at least one computing device" to "identify a management user" and "receive from the management user through the management portal application a customization to a master checklist," see '020 Patent at 19:48-19:55, and further states that the "management portal application send[s] data encoding each checklist to the handheld computing device", see id. at 19:65-19:66.  The specification of both Patents describes "corporate management portals" that "may . . . generate[ ] and customize[ ]" checklist data, see id.at 8:16-8:22; '810 Patent at 8:22-8:28, as well as "regional management portals" that can "further configure the master checklists for one or more food service establishments" by, for example, "chang[ing] a particular task or configur[ing] a temperature reading limit", see '020 Patent at 8:24-8:45; '810 Patent at 8:29-8:51.  The Claims and the broader specifications of both Patents therefore make clear that the management portal application is specifically intended to generate, configure, and send—i.e., manage—checklists.  By contrast, CM's proposed construction, "an application that provides an interface for managing data", is imprecise about the specific data that is being managed.

In sum, although the court is very cognizant that courts generally should not read limitations from the written descriptions into the claims, it concludes that, here, all the relevant evidence—including the language of the Claims themselves—supports the court's construction.  See Abbott Labs, 566 F.3d at 1288 (stating that a "court may reach a narrower construction, limited to the embodiment(s) disclosed in the specification, when the claims themselves, the specification, or the prosecution history clearly indicate that the invention encompasses no more than that confined structure or method").

The court therefore adopts the construction "portal application that provides an interface for management users to manage checklists."

     D.    <u>Claim Term Four: The Terms "Data Encoding Each Checklist" and "Data Encoding the Checklist" Should Be Construed to Mean "Each Checklist that Is Converted into a Coded Form for Transmission" and "the Checklist that Is Converted into a Coded Form for Transmission", Respectively</u>

The terms "data encoding each checklist" and "data encoding the checklist" can be found in Claims 1, 4, 5, 15, and 20 of the '020 Patent and Claims 1, 4, 5, 15, and 20 of the '810 Patent.  See Claims Chart at 4.  CM contends that the claim should be construed to mean "electronic information comprising a checklist."  See Pl.'s CC Br. at 11-12.  TransAct argues that the term "data encoding <u>each</u> checklist" need not be construed, but that if the court opts to do so, the term should be construed, "for practical purposes", as "each checklist".  See Def.'s CC Br. at 10-11.  TransAct further argues that the term "data encoding <u>the</u> checklist" is indefinite.  See <u>id.</u>

At the <u>Markman</u> hearing, the parties agreed to the court's construction of "data encoding each checklist" as "each checklist that is converted into a coded form for transmission."  Nonetheless, the court, again, briefly explains its rationale.  The court

finds that this construction conforms with the language of the relevant Claims, each of which recite one device that can send "data encoding each checklist" to another device. <u>See</u> '020 Patent at 19:65-19:67, 21:29-21:32, 22:40-22:42; '810 Patent at 20:3-20:5, 21:36-21:39, 22:45-22:47.  This construction also aligns well with the plain meaning of the term "encode", which Merriam-Webster defines as "to convert (something, such as a body of information) from one system of communication into another."  <u>See</u> <u>Encode</u>, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/encode (last visited February 15, 2024).  Taken together, the court finds that a person of ordinary skill in the art would construe the term to be "each checklist that is converted into a coded form for transmission."

In turn, the court declines to adopt plaintiff and defendant's initially proposed constructions.  The court agrees with CM that TransAct's proposed construction of "each checklist" is insufficient because it fails to give meaning to each of the specific terms in the claim.  <u>See</u> <u>Merck</u>, 395 F.3d at 1372 ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").  The court also finds that CM's proposed construction—"electronic information comprising a checklist"—does not adequately reflect the meaning of the claim term, particularly the word "encoding".

TransAct also asserts in its claim construction brief that the term "data encoding <u>the</u> checklist", which appears in dependent Claims 4 and 5 of the '020 and '810 Patents, is indefinite.  Def.'s CC Br. at 10-11.  The court disagrees.  As the Supreme Court has held, a claim is indefinite if, "read in light of the specification . . . and the prosecution history, [it] fail[s] to inform, with reasonable certainty, those skilled in the art about the

scope of the invention." Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. 898, 901

(2014). "Indefiniteness must be proven by clear and convincing evidence." Sonix Tech.

Co. v. Publ'ns Int'l, Ltd., 844 F.3d 1370, 1377 (Fed. Cir. 2017). At the Markman hearing

and in its briefing, TransAct argued that "data encoding the checklist", as it appears in

dependent Claims 4 and 5 of the '020 and '810 Patents, lacks a clear antecedent

basis.[4] See Papyrus Tech. Corp. v. N.Y. Stock Exch., 581 F. Supp. 2d 502, 534

(S.D.N.Y. 2008) ("To ensure clarity, 'a foundation or antecedent basis must be laid for

each element recited,' which can be accomplished 'by introducing each element with

the indefinite article ("a" or "an")' and modifying subsequent mentions of the element by

the 'definite article . . .'" (quoting John Gladstone Mills III et al., 2 Patent Law

Fundamentals § 14:13 (2d ed. 2004))).

     "When a claim term has no express antecedent basis, the claim term is indefinite

unless the context of the claim provides information to sufficiently clarify the boundary of

the claim." Haddad v. United States, 164 Fed. Cl. 28, 71 (Fed. Cl. 2023); accord ICM

Controls Corp. v. Honeywell Int'l, Inc., 256 F. Supp. 3d 173, 203 (N.D.N.Y. 2017)

("[E]ven without an explicit antecedent basis, a claim term is still not indefinite if its

meaning is sufficiently clear."). "[A]ntecedent basis in some cases can be implicit."

WAPP Tech. Ltd. P'ship v. Bank of Am., N.A., No. 4:21-CV-670, 2022 WL 2463569, at

*19 (E.D. Tex. July 6, 2022); accord Horus Vision, LLC v. Applied Ballistics, LLC, No.

13-CV-05460, 2014 WL 6989233, at *11 (N.D. Cal. Dec. 9, 2019) (noting that "[a]n

---

[4] At the Markman hearing, the defendant argued that the claim term would properly have "data encoding each checklist" in Claim 1 as an antecedent basis—and would, therefore, not be indefinite—if it were written as "the data encoding each checklist", rather than "data encoding the checklist".

antecedent basis can be present by implication" and the "context of the claim itself [can be] enough to imply the antecedent basis").

This is such a case. Claim 1 of both the '020 and '810 Patents claims either a "management portal application" or "instructions", respectively, that cause a computing device to, "in response to applying the customization to the master checklist, generate a checklist for" one of a "plurality of food service establishments . . . ." '020 Patent at 19:48-19:60; '810 Patent at 19:55-19:65 (emphasis added). The Claims further provide that the "management portal application" or "instructions" cause the computing device to "send data encoding each checklist to the handheld computing device at the respective one of the plurality of food service establishments[.]" '020 Patent at 19:65-19:67; '810 Patent at 20:3-20:5.

Claim 4 of both Patents, in turn, claims a particular form of the checklist distribution system articulated in Claim 1—i.e., a particular way in which checklist data can be sent to the handheld computing device. This reading is evident from both the Claim language, see '020 Patent at 20:25-20:28; '810 Patent at 20:32-20:36, and the specifications, see '020 Patent at 8:55-8:63 (teaching that the checklist application on the handheld computing device "may poll the server for an updated checklist"); '810 Patent at 8:61-9:2 (same). In claiming this particular form of checklist distribution, the Claim recites how a handheld computing device can poll and, in response, be sent data for one particular checklist that is customized for one particular food service establishment. Claim 4's use of the term "data encoding the checklist" is logical because it recites the teaching in the specifications that the checklist application on the handheld computing device "may poll the server for an updated checklist". '020 Patent

at 8:55-8:63; 8:61-9:2.  Given this context, it is evident that "data encoding the checklist" refers back to the Claim 1's recitation of (1) "a checklist" that is generated "for each one of the plurality of food service establishments" and, in turn, (2) "data encoding each checklist" that is sent to the handheld computing device "at the respective one of the plurality of food service establishments[.]"  '020 Patent at 19:48-19:67; '810 Patent at 19:55-20:5.  In other words, the term "data encoding the checklist" refers to one of the checklists that is sent to a handheld computing device at each of the various food safety establishments.  The same analysis applies to "data encoding the checklist" in Claim 5, which claims another form of the checklist distribution system in Claim 1—i.e., the checklist data is sent to the handheld computing device "via a network in response to the checklist being generated."  '020 Patent at 20:30-20:32; '810 Patent at 20:38-20:40; accord '020 Patent at 8:63-8:65 (specification teaching that "the checklist application may receive an updated checklist from the server automatically after the updated checklist is generated"); '810 Patent at 9:2-9:4 (same).

Because the court can deduce the meaning of the term "data encoding the checklist" as it is used in Claims 4 and 5 through the broader Claim language and the written specifications, it cannot conclude that the term "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." Nautilus, 572 U.S. at 901.  As such, the court finds that the term "data encoding the checklist" in Claims 4 and 5 of the '020 Patent and '810 Patent is not indefinite.

The court therefore adopts the constructions "each checklist that is converted into a coded form for transmission" and "the checklist that is converted into a coded form for transmission."

16

E.    Claim Term Five: The Term "Send Data Encoding Each Checklist" and Its Related Terms Require No Further Construction

The term "send data encoding each checklist", as well as the related terms, "send each checklist", "send data encoding the checklist", and "sending . . . data encoding each checklist" are located in Claim 1 of the '788 Patent; Claims 1, 4, 5, 15, and 20 of the '020 Patent; and Claims 1, 4, 5, 15, and 20 of the '810 Patent.  See Claims Chart at 5.  CM proposes that the terms be construed to mean "arrange for the delivery of electronic information comprising a checklist", see Pl.'s CC Br. at 13-16, whereas TransAct contends that the terms need not be construed,[5] see Def.'s CC Br. at 11-12.

The court incorporates its construction of "data encoding each checklist" and "data encoding the checklist", see Section IV.D, supra, and it otherwise finds that these terms require no additional construction because the plain and ordinary meaning of "send" is clear.  The court finds CM's proposed construction of "send"—"arrange for the delivery of . . ."—is unnecessary and creates ambiguity.  See Chapco, 2016 WL 7168375, at *4 (declining to adopt a construction that would render ambiguous the meaning of the term at issue).

As noted above, TransAct confirmed in its briefing and at the Markman hearing[6] that it is not arguing that this court should construe the term "send data encoding each checklist" to solely encompass "push" technology—i.e., technology in which the request

---

[5] TransAct also contends, as it did with the term "data encoding the checklist", that the claim term "send data encoding the checklist" is indefinite.  See Def's CC Br. at 12.  As discussed above, see Section IV.D, supra, the court rejects this argument.

[6] At the Markman hearing, the plaintiff informed the court that it would accept the court's preliminary decision not to construe the term, provided that the court avoid limiting the term to only encompass "push" technology.

17

for transmission is initiated by the sender, <u>see</u> Pl.'s CC Br. at 9.  Indeed, the court

declines to do so because there is no evidence in the record that such a limitation

exists.  Rather, there is intrinsic evidence that the encoded checklists can also be sent

with "pull" technology—<u>i.e.</u>, technology in which the request for transmission is issued

by the recipient, <u>see id.</u>  <u>See, e.g.</u>, '788 Patent at 7:59-7:65 (describing how "the

checklist distribution may be performed either in a push or pull configuration"); '020

Patent at 8:59-8:63 (same); '810 Patent at 8:65-9:2 (same).

In sum, the court concludes that the term "send data encoding each checklist"

and its related terms require no further construction.

F.    <u>Claim Term Six: The Terms "Obtain a Plurality of Responses to Each
      Checklist" and "Obtaining . . . a Plurality of Responses to Each Checklist"
      Require No Further Construction</u>

The terms "obtain a plurality of responses to each checklist" and "obtaining . . . a

plurality of responses to each checklist" can be found in Claim 1 of the '788 Patent;

Claims 1, 15, and 20 of the '020 Patent; and Claims 1, 15, and 20 of the '810 Patent.

<u>See</u> Claims Chart at 6.  CM proposes that the terms be construed to mean "acquire

electronically a plurality of information corresponding to responses to a checklist", <u>see</u>

Pl.'s CC Br. at 16-18, while TransAct argues that the claim need not be construed

because its plain and ordinary meaning is clear, <u>see</u> Def.'s CC Br. at 12.

The court agrees with TransAct that the terms require no further construction.

The plain and ordinary meaning of the terms are clear, and the court finds that CM's

proposed construction of "obtain"—"acquires electronically"—is unnecessary and does

not further elucidate the meaning of the terms.  Moreover, the court disagrees with CM's

additional construction of " . . . a plurality of information corresponding to responses to a

checklist" because the plain meaning of " . . . plurality of responses to each checklist" is

already clear on its face.  That portion of CM's proposed construction is, in this court's view, superfluous.

However, the court agrees with CM's position that the word "obtain . . ." is not confined to "pull" technology because there is intrinsic evidence that checklist responses can be obtained by the computing device via "push" technology.[7]  See, e.g., '718 Patent at 11:18-11:28 (describing how checklist responses can be obtained by the computing device by, inter alia, "the handheld computing device and docking station . . . transfer[ring] the checklist responses to the server"); '020 Patent at 12:18-12:28 (same); '810 Patent at 12:24-12:34 (same).

The court therefore finds that the terms "obtain a plurality of responses to each checklist" and "obtaining . . . a plurality of responses to each checklist" require no further construction.

G.    Claim Term Seven: The Term "Time Interval Has Not Been Completed" Requires No Further Construction

The term "time interval has not been completed" appears in Claim 1 of the '788 Patent.  See Claims Chart at 7.  CM proposes that the court construe the term to mean "a period of time for which data has not been collected", see Pl.'s CC Br. at 18-19, though it noted at the Markman hearing that it would not object to the court declining to construe the term.  Transact argues that the term requires no construction but, if the court does construe it, the claim term should be construed to mean "the time interval previously referenced in the claim has not been completed."  Def.'s CC Br. at 12-13.

---

[7] Again, plaintiff informed the court, at the Markman hearing, that it would accept the court's preliminary decision not to construe the term, provided that the court avoid limiting the term to only encompass "pull" technology.

Here, the court agrees with TransAct that the term need not be construed because its plain and ordinary meaning is already clear.  There is no evidence in the Patent or the broader intrinsic record that the Patent authors intended the term to mean anything other than its plain and ordinary meaning.

The court finds the Patent's specification further supports TransAct's position. The specification describes a "customized time and temperature log", "generated by the web portal application in various embodiments", "[that] may be, for example, in a grid arrangement" with various possible features, including "a target temperature and a plurality of times at which the checklist tasks are to be performed."  '788 Patent at 14:42-14:58.  The specification includes the below illustration, which constitutes a potential embodiment of the time and temperature log:



| Time and Temperature Log – 2009-06-21 (0151 – Mars Hill Location) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Target Temperature | 9:00am | 11:00am | 1:00pm | 3:00pm | 5:00pm | 7:00pm | 9:00pm |
| Prep area room temperature | 50F – 70F | 67 | | | | 65 | | |
| Walk-in cooler | 34F – 40F | 36 | | | | 36 | | |
| Dressing station cooler | 34F – 40F | 37 | | | | 38 | | |
| Grill cooler | 34F – 40F | 32 | | | | 31 | | |
| Sliced tomatoes in dressing station | 34F – 40F | | 39 | 38 | 39 | 39 | 37 | |
| Cut potatoes soaking | 70F or below | | 0 | 0 | 0 | 0 | 0 | |
| Cooked Fries in Dump Station | 140F or higher | | | 0 | | | 177 | |

# FIG. 17

1700

See '788 Patent at 16.  The illustration displays entries for temperature data and food temperature data, at various points in time over the course of a full day.  See id.  It also appears, from the illustrated embodiment, that the log can display data for a time interval before the time interval has been completed.  See id.

The court, in turn, finds that CM's initial proposed construction of "a period of time for which data has not been collected" is not congruent with the language of the claim term itself or the broader Claim language, as TransAct notes.  See Def.'s CC Reply at 6 (noting that "[p]laintiff's proposed construction would result in a nonsensical reading of ' . . . for a time interval, wherein a period of time for which data has not been collected and the report includes . . . .'" (emphasis in original) (quoting '788 Patent at 19:1-19:3)).  More importantly, CM's initial proposed construction, while not necessarily illogical, does not, in this court's view, provide any additional clarity as to the meaning of the term.  A court will not adopt a construction that fails to further elucidate the meaning of a claim term.  See Chapco, 2016 WL 7168375, at *4.  Thus, the court will not adopt plaintiff's initial proposed construction.

The court therefore concludes that the term "time interval has not been completed" should be given its plain and ordinary meaning and does not require further construction.

> H.    Claim Term Eight: The Term "Future Temperature Data and Future Food Temperature Data" Should Be Construed to Mean "Temperature Data and Food Temperature Data for a Time After the Time Interval"

The term "future temperature data and future food temperature data" is used in Claim 1 of the '788 Patent.  See Claims Chart at 8.  CM proposes the construction "temperature data and food temperature data yet to be collected".  See Pl.'s CC. Br. at 19.  TransAct contends that the claim term does not require construction but, if

construed, its construction should be "temperature data and food temperature data for a time after the time interval".  See Def.'s CC Br. at 13-14.

Here, the court agrees with TransAct's proposed, alternative construction of "temperature data and food temperature data for a time after the time interval" because it aligns with the overarching Claim language, which claims a report that includes "at least the respective temperature data and respective food temperature data for a time interval, wherein the time interval has not been completed and the report includes a plurality of regions for future temperature data and future food temperature data." '788 Patent at 18:65-19:3 (emphasis added).  The construction " . . . for a time after the time interval" correctly reflects the meaning of the word "future" in this context—i.e., the time interval has not been completed, and the plurality of regions for "future" temperature data are for a time after the time interval "including . . . the respective temperature data and respective food temperature data."  Id.

Although CM is correct that the specifications describe "a report in the form of a customized time and temperature log" that "may include a plurality of regions for future temperature data, future food temperature data, future humidity data, and/or other data yet to be collected", id. at 14:66-15:3, the court does not believe that this construction fully and accurately reflects the Claim.  As iterated above, Claim 1 recites a report that "includes a plurality of regions for future temperature data and future food temperature data."  Id. at 18:65-19:3.  Given this language, the term "future temperature data and future food temperature data" is not limited only to data "yet to be collected".  Rather, it appears that the term also refers to data that could be collected and added to those "regions"—regardless of whether the data is, ultimately, collected.  As the specification

22

makes clear, there are times when the data for a particular region may, for various reasons, not be collected.  See id. at 14:62-14:66 ("Absence of data may signify that the user was not to perform the task at that time. Zeros or other out of range indications may show that the task was not performed, that the equipment was malfunctioning, that the task was performed improperly, etc.").

The court will therefore adopt TransAct's proposed alternative construction of "temperature data and food temperature data for a time after the time interval".

I.   Claim Term Nine: The Term "Base Station Device" Should Be Construed to Mean "Data Transceiver for Connecting a Wireless Device to a Network"

The term "base station device" is used in Claims 1, 15, and 20 of the '810 Patent. See Claims Chart at 9.  CM argues that the court should construe the term to mean "data transceiver for connecting a wireless device to a network", see Pl.'s CC Br. at 19-21, while TransAct contends the term should be construed as "docking station for a handheld computing device", see Def.'s CC Br. at 14-16.  The court adopts plaintiff's construction.[8]

As always, in determining the scope of a claim term, the court looks to the term's ordinary and plain meaning.  "The ordinary meaning of a claim term is not 'the meaning of the term in the abstract.'"  Eon Corp. IP Holdings v. Silver Spring Network, 815 F.3d 1314, 1320 (Fed. Cir. 2016) (quoting Phillips, 415 F.3d at 1321).  Rather, "the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire

---

[8] At the Markman hearing, the court noted the difficulty in construing this term, voiced its disagreement with much of plaintiff's argument regarding the term, and offered a preliminary construction of "device, other than the handheld computing device, that can receive temperature data."  It has since decided to adopt plaintiff's construction.

patent." Phillips, 415 F.3d at 1321. "A word describing patented technology takes its definition from the context in which it was used by the inventor." Anderson v. Int'l Eng'g & Mfg., Inc., 160 F.3d 1345, 1348-49 (Fed. Cir. 1998).

The court notes, at the outset, that there is "no single, accepted meaning" of the term "base station device", such that the term is entirely clear and self-explanatory to a person of ordinary skill in the art. Eon Corp., 815 F.3d at 1322. Notably, the specific term "base station device" is not used or discussed in the detailed description of the '810 Patent or either of its parent Patents.[9] Nor does the prosecution history of the '810 Patent elucidate the meaning of the term as it is used in the '810 Patent. As such, the court must attempt to glean the meaning of the term from the broader context of the Patent.

In determining the meaning of the term, the court first looks to claim language. Each Claim that uses the term "base station device" recites:

> . . . temperature data automatically measured by at least one stationary sensor and wirelessly communicated from the at least one stationary sensor to at least one of: the handheld computing device or a base station device, and food temperature data measured by at least one handheld temperature sensor and wirelessly communicated from the at least one handheld temperature sensor to at least one of: the handheld computing device or the base station device[.]

'810 Patent at 20:10-20:19, 21:45-21:53, 22:53-22:62. Indeed, the term is exclusively used in reference to the transmittal and receipt, via wireless communication, of temperature data. Thus, the "data transceiver . . ." portion of CM's construction appears to align with the relevant Claim language.

---

[9] As discussed below, the term "base station" is used once in Claim 15 of the '788 Patent. '788 Patent at 21:8-21:12.

In addition, the court finds that there is intrinsic evidence to support the  ". . . for connecting a wireless device to a network" portion of CM's proposed construction. Claim 1 of the '810 Patent recites how "instructions executable in the at least one computing device", when executed, "cause the at least one computing device" to, inter alia, "obtain a plurality of responses" including temperature data wirelessly communicated from the stationary sensor and handheld temperature sensor to "at least one of: the handheld computing device or a base station device."  Id. at 19:49-20:19. The specification, in turn, teaches that these aforementioned "responses" are obtained by the server by way of the network.  See, e.g., id. at 6:13-6:15, 16:56-16:59.  The specification further explains how the handheld temperature sensor may be configured to send its "[temperature] reading to the server, the docking station, or to some other intermediate device."  '810 Patent at 11:23-11:26 (emphasis added).  The use of "intermediate device", in this context, suggests that the term "base station device", as it is used in the Patent, refers to any device that can receive wireless communications from the stationary sensor and handheld temperature sensor, which can then be obtained by the server by way of the network.[10]

---

[10] The court notes, however, that it is skeptical of CM's argument that the "base unit" of the stationary sensor could be "configured" to be a "gateway device for communication over network", thereby making it a "base station device".  See Pl.'s CC Br. at 20-21 (citing Expert Report of William O. Putnam ("Putnam Report"), Ex. E, at ¶ 98 (Doc. No. 124-5)).  The Claims explicitly recite a "stationary sensor" wirelessly communicating temperature data to a "base station device".  '810 Patent at 20:10-20:15, 21:45-21:49, 22:53-22:57.  The Patent's specification also repeatedly teaches that the "base unit" is a component part of the stationary sensor.

Thus, plaintiff's configuration would effectively mean that the stationary sensor itself can constitute a "base station device".  This construction would not logically cohere with the specific language of the Patent Claims, which describe the stationary sensor wirelessly communicating with the base station device.  Moreover, CM's hypothetical configuration is not present in the specification of the '810 Patent or the specification of either of its parent Patents.  Rather, as TransAct notes, the hypothetical configuration is only described in a Report by William O. Putnam, CM's expert witness.  See Pl.'s CC Br. at 20-21 (citing Putnam Report at ¶ 98).

Notably, both parties appear to agree that the term "base station device", as it is used in the independent Claims of the '810 Patent, encompasses the "docking station" described throughout the written descriptions of the Asserted Patents.  See Markman Hr'g Tr. (plaintiff's counsel stating that the base station device is "something in addition to just a docking station"); Def.'s CC Br. at 14-16 (defendant arguing that the court should construe the term to mean "docking station for a handheld computing device"). TransAct contends, however, that the claim term should be read solely to mean "docking station for a handheld computing device", and nothing more.  In support of its proposed construction, TransAct notes that Claim 15 of the '788 Patent, of which the '810 Patent is a continuation-in-part, recites a "system . . . comprising a base station configured to receive and supply power to the handheld computing device and including a button to initiate sending of data from the handheld computing device to the at least one server."  Def.'s CC Br. at 15 (quoting '788 Patent at 21:8-21:12 (emphasis added)). The language of Claim 15, as defendant notes, appears to recite what is described in the specification of the '788 Patent as a "docking station".

The court is not convinced, however, that the term "base station", as it is used in the '788 Patent, is sufficient to elucidate fully the meaning of the term "base station device" as it is used in the '810 Patent.  First, the term used in the '810 Patent is "base station device"—which, while undoubtedly similar, is different than the term "base station" that is used in the '788 Patent.  "Different claim terms are presumed to have different meanings."  Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp., 533 F.3d 1362, 1371 (Fed. Cir. 2008).

Second, the claim term "base station device" arises in a different context in the Claims of the '810 Patent, as compared to the '788 Patent.  See Hockerson-Halberstadt, Inc. v. Converse Inc., 183 F.3d 1369, 1374 (Fed. Cir. 1999) ("Proper claim construction . . . demands interpretation of the entire claim in context, not a single element in isolation.").  As discussed above, in the '810 Patent, the Claims recite stationary sensors and handheld temperature sensors capable of wireless communication with "at least one of: the handheld computing device or a base station device".  Although the specification of the '810 Patent describes the stationary sensors and handheld temperature sensors communicating with the docking station or the server, it also describes other intermediate devices that are capable of receiving temperature data from the handheld temperature sensor.  See '810 Patent at 7:46-7:49 ("In some embodiments, the stationary sensors may be configured to send data automatically to server over the network, bypassing the handheld computing device and/or the docking station"); id. at 11:23-11:26 ("In other embodiments, the handheld temperature sensor may be configured to send the [temperature] reading to the server, the docking station, or to some other intermediate device." (emphasis added)).  Thus, it is not clear, from the '810 Patent, that the term "base station device" was intended solely to mean "docking station for a handheld computing device".

Third, even if the court were to accept that the term "base station" as used in the '788 Patent is identical to the term "base station device" as used in the '810 Patent, there is still evidence suggesting the term "base station", as it is used in the '788 Patent, goes beyond defendant's proposed construction.  As CM notes, construing the term "base station" in Claim 15 of the '788 Patent to be "docking station for a handheld

computing device" appears to render superfluous the Claim language following the term

"base station": "a base station configured to receive and supply power to the handheld

computing device . . . ." '788 Patent at 21:8-21:12; accord Stumbo, 508 F.3d at 1362

(noting that the Federal Circuit generally disapproves of claim constructions that renders

Claim language "superfluous"). The Claim language also suggests that, in reciting how

the base station can be "configured" to function as a docking station, the term "base

station" may encompass more than just a "docking station". As such, the court will not

adopt TransAct's narrowing construction.

In sum, the court adopts plaintiff's proposed construction. It cannot accept

defendant's proposed construction, which appears to be narrower than the intrinsic

evidence allows. The court concludes that the construction that is consistent with the

Claim language and the broader specification is "data transceiver for connecting a

wireless device to a network," and it will construe the term accordingly.

The court recognizes the breadth of this construction. As noted at the Markman

hearing, the court is mindful that claims can be invalidated when they contain indefinite

terms. Ave. Innovations, Inc. v. E. Mishan & Sons Inc., 310 F. Supp. 3d 457, 462

(S.D.N.Y. 2018) ("[S]ummarily speaking, an indefinite claim is an invalid claim."). Here,

the court construes "base station device" without prejudice to the defendant raising the

argument that the term is invalid as indefinite. Neither party addresses the issue of

indefiniteness as to this term in their claim construction briefing, and the court notes that

the issue of invalidity more generally is ordinarily resolved at the summary judgment

stage. As such, the court will determine the issue of validity, including possible

indefiniteness as to this Claim term, at the summary judgment stage.

J.  Claim Term Ten: The Terms "Communicate Wirelessly with the at Least One Stationary Sensor" and "Wirelessly Communicated from the at Least One Stationary Sensor to the Handheld Computing Device" Require No Further Construction

The term "communicate wirelessly with the at least one stationary sensor" is used in Claim 3 of the '788 Patent, see '788 Patent at 19:6-19:10, and the term "wirelessly communicated from the at least one stationary sensor to the handheld computing device" is used in Claim 1, 15, and 20 of the '020 Patent, see '020 Patent at 20:7-20:9, 21:39-21:41, 22:49-22:50.  CM proposes that this court construe the terms to mean "transmitted from the stationary sensor to the handheld computing device, where at least part of the data transmission is performed wirelessly".  See Pl.'s CC Br. at 22-23.  TransAct argues that the terms should be given their plain and ordinary meaning and require no further construction.  See Def.'s CC Br. at 16-17.  The court agrees with TransAct.

As the defendant notes, it appears that the only portion of either term that the parties dispute is "communicate wirelessly" or "wirelessly communicated".  See Def.'s CC Br. at 16; accord Pl.'s CC Br. at 22-23.  The plain and ordinary meaning of "communicate wirelessly" (or "wirelessly communicated") is, in this court's view, clear on its face.  See Summit 6, 802 F.3d at 1291 ("Because the plain and ordinary meaning of the disputed claim language is clear, the district court did not err by declining to construe the claim term.").  CM proposed construction—"transmitted from the stationary sensor to the handheld computing device, where at least part of the data transmission is performed wirelessly"—i.e., the communication can be partially wired—contravenes the plain meaning of "wirelessly communicated".

Notably, the Patent's specification describes communication between the handheld computing device and various other devices, including the stationary sensors, that can be both wireless and wired.  See, e.g., '020 Patent at 3:28-3:30 ("The handheld computing device may communicate with such devices by wired and/or wireless communication." (emphasis added)).  The Claims themselves, however, expressly claim wireless communication.  Where the plain meaning of Claim language is unambiguous and susceptible to only one reasonable construction, a court cannot "interpret the claim contrary to its plain meaning", even if the construction excludes certain disclosed embodiments in the specification.  See Unique Concepts, Inc. v. Brown, 939 F.2d 1558, 1562-63 (Fed. Cir. 1991) (noting that "subject matter disclosed but not claimed in a patent application is dedicated to the public").[11]

CM does not appear to contest that the "wirelessly communicated . . ." limitation, by its very terms, cannot encompass communication that is fully wired.  Indeed, it is clear from the Patent that the authors knew how to describe "wired", as opposed to "wireless", communication.  CM argues, however, that "Defendant's implied construction of the terms . . . to be limited to only wireless transmission from start to finish ignores th[e] express teaching of the specification that the stationary sensor can bypass the docking station (as well as the handheld computer device) to communicate directly with the server", in which, according to CM's expert William Putnam, "[t]he server can then

---

[11] As TransAct notes, the Patent applicants added the term "wirelessly communicated from the at least one stationary sensor to the handheld computing device" to the Patent Claims during the prosecution history of the '020 Patent to avoid a double patenting rejection.  See Remarks for Application Number 15/804,483, Def.'s Ex. 11, at 14 (Doc. No. 199-26) ("Further, claim 20 has been amended to recite 'temperature data automatically measured by at least one stationary sensor and wirelessly communicated from the at least one stationary sensor to the handheld computing device,' which by taking place automatically and wirelessly does not require human activity.").

communicate the transmitted information to the handheld computing device via the network."  See Pl.'s CC Br. at 22 (citing Expert Report of William O. Putnam, Pl.'s Ex. E, at ¶ 106 (Doc. No. 124-5)).  First, while CM is correct that the '788 and '020 Patent specifications provide that, "[i]n some embodiments, the stationary sensors may be configured to send data automatically to server over the networks, bypassing the handheld computing device", see Patent '788 at 6:40-6:43; '020 Patent at 7:40-7:43, the specifications cited by Mr. Putnam do not describe the server then communicating the transmitted information to the handheld device.  Second, even accepting Mr. Putnam's potential configuration as plausible, it is not clear, from the Patent itself or Mr. Putnam's testimony, that such a configuration supports plaintiff's proposed construction of " . . . where at least part of the data transmission is performed wirelessly", and is therefore partially wired.  CM's argument does not give this court any reason to ignore the plain and ordinary meaning of "wirelessly communicated".  Thus, without sufficient support in the Patent or other intrinsic evidence, the court declines to adopt CM's proposed construction.

In sum, the court sees no reason as to why it should adopt a construction of "wirelessly communicated . . ." that contradicts the term's plain and ordinary meaning. The court will therefore construe the terms "communicate wirelessly with the at least one stationary sensor" and "wirelessly communicated from the at least one stationary sensor to the handheld computing device" to be given their plain and ordinary meaning, and it will not construe them further.

K.  Claim Term Eleven: The Term "Wirelessly Communicated from the at Least One Stationary Sensor to at Least One of: the Handheld Computing Device or a Base Station Device" Requires No Further Construction

The term "wirelessly communicated from the at least one stationary sensor to at least one of: the handheld computing device or a base station device" is used in Claims 1, 15, and 20 of the '810 Patent.  See Claims Chart at 11.  CM asks that the court construe the term to mean "transmitted from the stationary sensor to either the handheld computing device or a base station device, where at least part of the data transmission is performed wirelessly", see Pl.'s CC Br. at 23-24, while TransAct asserts that the term requires no further construction, and the court need only insert its construction of "base station device", see Def.'s CC Br. at 17-18.

Here, the court need not construe this term further because it has already construed its component terms: it has construed "base station device" to mean "data transceiver for connecting a wireless device to a network," see Section IV.I, supra, and it has declined to further construe "wirelessly communicated . . .", see Section IV.J, supra.  As this court has previously noted, "[c]laim construction 'is not an obligatory exercise in redundancy,'" and so the court need not "further construe [a] phrase [whose] meaning will be clear from the construction of the component terms."  See Chapco, 2016 WL 7168375, at *9 (citing United States Surgical Corp. v. Ehticon, Inc., 103 F.3d 1554, 1568 (Fed Cir. 1997)).  The court therefore will not construe this term any further.

L.  Claim Term Twelve: The Term "Network Page" Should Be Construed to Mean "Information for Display Delivered Via a Network"

The term "network page" is used in Claim 1 of the '788 Patent; Claims 1, 15, and 20 of the '020 Patent; and Claims 1, 15, and 20 of the '810 Patent.  See Claims Chart at 12.  CM argues that this court should construe the term to mean "information for display

delivered via a network", see Pl.'s CC Br. at 24-25, whereas TransAct argues that the term requires no further construction because its ordinary and plain meaning is clear, see Def.'s CC Br. at 18.[12]  Here, the court finds that CM's proposed construction comports with the Claim language and broader specifications.  The independent Claims of each Patent recite a "network page" "summarizing the responses to the checklist" for a "plurality of food service establishments".  See '788 Patent at 18:62-18:64; '020 Patent at 20:14-20:16; '810 Patent at 20:20-20:22.  Moreover, as CM notes, the specifications further state that the network pages "function[ ] as an administration and monitoring interface for a plurality of food service establishments".  See '788 Patent at 5:49-5:51; '020 Patent at 6:49-6:51; '810 Patent at 6:57-6:59.  The Claims therefore recite information—i.e., checklist responses from food service establishments—that are displayed to, and administered and monitored by, a user.  Thus, contrary to defendant's assertions, see Def.'s CC Reply at 9-10, there is support in the intrinsic record for plaintiff's construction.  As such, the court finds that CM's proposed construction accurately reflects the meaning of the term as it is used in the three Patents, and it will construe "network page" to mean "information for display delivered via a network."

## V.    CONCLUSION

For the reasons stated above, the court construes the disputed terms according to the table below:

---

[12] TransAct originally stated that, "[i]f . . . the Court construes this claim term," it did "not object to Plaintiff's proposed construction of 'information for display delivered via a network'", see Def.'s CC Br. at 18, but it subsequently retracted that position and asserted in its Reply brief that, "upon review of Plaintiff's Opening Brief . . . Defendant has reconsidered and believes Plaintiff's proposed construction is not supported by the intrinsic evidence", see Def.'s CC Reply at 9.  However, at the Markman hearing, TransAct informed the court that it would not object to the court's preliminary decision to adopt plaintiff's proposed construction of "information for display delivered via a network."

| Disputed Term | CM's Construction | TransAct's Construction | Court's Construction |
|---|---|---|---|
| 1. Computing device | A device comprising a processor and a memory. | No further construction necessary.<br><br>If construed: Server | No further construction necessary. |
| 2. Application causes | Application makes happen. | No further construction necessary. | No further construction necessary. |
| 3. Management portal application | An application that provides an interface for managing data. | No further construction necessary.<br><br>If construed: Web portal application. | Portal application that provides an interface for management users to manage checklists. |
| 4. Data encoding each checklist / Data encoding the checklist | Electronic information comprising a checklist. | Each checklist.<br><br>Asserts "data encoding the checklist" is indefinite. | Each checklist that is converted into a coded form for transmission / The checklist that is converted into a coded form for transmission. |
| 5. Send each checklist / Send data encoding each checklist / Sends data encoding the checklist / Sending . . . data encoding each checklist | Arrange for the delivery of electronic information comprising a checklist. | No further construction necessary. | No further construction necessary. |
| 6. Obtain a plurality of responses to each checklist / Obtaining . . . a plurality of responses to each checklist | Acquire electronically a plurality of information corresponding to responses to a checklist. | No further construction necessary. | No further construction necessary. |
| 7. Time interval has not been completed | A period of time for which data has not been collected. | No further construction necessary. | No further construction necessary. |

| | | If construed: The time interval previously referenced in the claim has not been completed. | |
|---|---|---|---|
| 8. Future temperature data and future food temperature data | Temperature data and food temperature data yet to be collected. | No further construction necessary.<br><br>If construed: Temperature data and food temperature data for a time after the time interval. | Temperature data and food temperature data for a time after the time interval. |
| 9. Base station device | A data transceiver for connecting a wireless device to a network. | Docking station for a handheld computing device. | Data transceiver for connecting a wireless device to a network. |
| 10. Communicate wirelessly with the at least one stationary sensor / Wirelessly communicated from the at least one stationary sensor to the handheld computing device | Transmitted from the stationary sensor to the handheld computing device, where at least part of the data transmission is performed wirelessly. | No further construction necessary. | No further construction necessary. |
| 11. Wirelessly communicated from the at least one stationary sensor to at least one of: the handheld computing device or a base station device | Transmitted from the stationary sensor to either the handheld computing device or a base station device, where at least part of | No further construction necessary. | No further construction necessary. |

| | the data transmission is performed wirelessly. | | |
|---|---|---|---|
| 12. Network page | Information for display delivered via a network. | No further construction necessary.<br><br>If construed: Web page or Web page delivered via a network. | Information for display delivered via a network. |

**SO ORDERED.**

Dated at New Haven, Connecticut this 15th day of February 2024.

 /s/ Janet C. Hall
Janet C. Hall
United States District Judge