### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CM SYSTEMS, LLC, | : | |
| Plaintiff, | : | CIVIL CASE NO. |
| | : | 3:22-CV-00624 (JCH) |
| v. | : | |
| | : | |
| TRANSACT TECHNOLOGIES, INC., | : | |
| Defendant. | : | FEBRUARY 27, 2024 |

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 199), PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 206), AND MOTIONS TO SEAL (DOC. NOS. 201, 208, 213, 221, & 228)

## I.     INTRODUCTION

Plaintiff CM Systems, LLC ("CM") brings this action against defendant TransAct Technologies, Inc. ("TransAct") under section 271 of title 35 of the United States Code. See Supplemented Complaint ("Compl.") (Doc. No. 53). CM asserts that TransAct has infringed CM's Patent Nos. 9,811,788 (hereinafter "the '788 Patent"), 11,004,020 (hereinafter "the '020 Patent"), and 11,449,810 (hereinafter "the '810 Patent"). Id. In response, TransAct seeks a declaration of noninfringement as to each asserted Patent, and it further contends that each asserted Patent is invalid. See Answer, Affirmative Defenses, and Counterclaims ("Answer") (Doc. No. 56).

The parties have both filed cross Motions for Summary Judgment. See TransAct's Motion for Summary Judgment ("Def.'s Summ. J. Mot.") (Doc. No. 199); CM's Motion for Summary Judgment on Validity and Infringement ("Pl.'s Summ. J. Mot.") (Doc. No. 206). In addition, both parties have filed various related Motions to Seal (Doc. Nos. 201, 208, 213, 221, and 228).

1

For the reasons set forth below, TransAct's Motion for Summary Judgment is granted in part and denied in part; CM's Motion for Summary Judgment is granted in part and denied in part; and the various Motions to Seal are either granted or granted in part and denied in part.  The portions of plaintiff and defendant's existing Motions for Summary Judgment, as they pertain to the '810 Patent, are terminated as moot in light of this court's Order granting the parties leave to file renewed Motions for Summary Judgment as to as to validity (or invalidity) and infringement (or noninfringement) of the '810 Patent.

## II.    BACKGROUND

### A.    Factual Background[1]

#### 1.    Asserted Patents

CM asserts that TransAct has infringed various Claims of three of its Patents: the '788 Patent, the '020 Patent, and '810 Patent.  See Plaintiff's Local Rule 56(a)2 Statement ("Pl.'s LR 56(a)2 Stmt.") ¶¶ 1, 4, 8 (Doc. No. 220-1).[2]  The '020 Patent is a continuation-in-part of the '788 Patent, and the '810 Patent is a continuation of the '020 Patent and a continuation-in-part of the '788 Patent.  See Defendant's Local Rule 56(a)2 Statement ("Def.'s LR 56(a)2 Stmt.") ¶¶ 18, 22 (Doc. No. 214-1).

Each of these three Patents (hereinafter "the Asserted Patents") are titled "Food Safety Management System", and they each describe technological components that

---

[1] The court draws primarily from the parties' Local Rule 56(a) Statements and supporting Exhibits in summarizing the material facts.  Unless otherwise noted, the facts are undisputed.  In addition, for ease of reference, the court cites to each party's respective Local Rule 56(a)2 Statement because, in accordance with Local Rule 56(a)2, they contain a reproduction of each numbered paragraph from the moving party's Local Rule 56(a)1 Statement, as well as the nonmoving party's admissions and denials.

[2] The court will cite to the unredacted versions of the parties' Local Rule 56(a)2 Statements, rather than the redacted versions.

comprise various embodiments of a system for monitoring and managing food safety. See '788 Patent, Pl.'s Ex. A (Doc. No. 206-3); '020 Patent, Pl.'s Ex. B (Doc. No. 206-4); '810 Patent, Pl.'s Ex. C (Doc. No. 206-5).  Specifically, the Asserted Patents describe, inter alia, a system that includes: a handheld computing device that displays checklists of various tasks to be performed in a food service establishment; handheld temperature sensors; stationary sensors; and a server that runs an application for management and reporting.  See '788 Patent; '020 Patent; '810 Patent.  Users can create checklists through the application and send those checklists to the handheld computing device, see, e.g., '788 Patent at 7:54-7:58, and food service workers can use these electronic checklists to gather and manage data, see, e.g., id. at 8:14-8:18.  The system gathers the checklist response data, which includes "data entered on the touchscreen of the handheld computing device, temperature data, humidity data, and/or other data measured by one or more stationary sensors, and food temperature data."  See, e.g., id. at 11:9-11:14.

The '788 Patent was filed on July 1, 2009.  See Def.'s LR 56(a)2 Stmt. ¶ 9; '788 Patent at 1.  During prosecution of the '788 Patent, the United States Patent and Trademark Office ('USPTO") issued numerous, non-final decisions rejecting the application claims of the '788 Patent; on January 12, 2017, the Patent Trial and Appeal Board ("PTAB") issued a decision "affirming all grounds of rejection [of the application claims] except for rejections of application Claims 4 and 7 under 35 U.S.C. § 103(a)".  Pl.'s LR 56(a)2 Stmt. ¶¶ 12-13; accord Decision on Appeal, Def.'s Ex. 5 to Declaration of Neal M. Cohen ("Cohen Decl."), at 8-15 (Doc. No. 199-20).  Specifically, the PTAB concluded that most of the application claims were unpatentable because they were

"obvious"—i.e., insufficiently distinct from the relevant prior art, which consisted of three preexisting patent application publications: Pub. No. 2008/0120188 A1 ("Mobley"), Pub. No. 2006/0213904 ("Kates"), and Pub. No. 2006/0149642 A1 ("Dillard").  See Decision on Appeal at 4.  However, the PTAB found that application Claim 4 contained critical differences that rendered it non-obvious over the prior art.[3]  Id. at 12-13.  The applicants responded to the PTAB's decision by, inter alia, cancelling application Claim 1 and amending application Claim 4; application Claim 4 was subsequently issued as Claim 1 in the final '788 Patent.  Pl.'s LR 56(a)2 Stmt. ¶¶ 14-15.

The plaintiff also submitted a Patent Cooperation Treaty ("PCT") Application for the '788 Patent.  See Opinion on PCT Application of the '788 Patent ("PCT Opinion"), Def.'s Ex. 17 to Cohen Decl. (Doc. No. 199-32).  In the Written Opinion of the International Searching Authority ("ISO"), the ISO Examiner concluded, inter alia, that application Claim 4 "lacked inventive step as being obvious over Mobley" combined with an additional prior art reference, Pub. No. 2005/0222778 A1 ("Levinson").[4]  Id. at 5.

The final '788 Patent was issued on November 7, 2017.  See '788 Patent. Notably, each of the relevant prior art references—Mobley, Kates, Dillard, and Levinson, as well as the PCT Written Opinion—were listed on the face of the '788 Patent.[5]  See

---

[3] Specifically, the PTAB found that application Claim 4 was not obvious because the prior art, unlike the application claim, did not "disclose[ ] . . . [a] log report" used for a "time interval that has not been completed . . . and includes a plurality of regions for future temperature data and food temperature data".  Decision on Appeal at 13 (internal quotation marks and brackets omitted).

[4] The abstract of Levinson describes the invention as "[a] system, method, and computer-readable medium for the collecting and storing of environmental data, and generating a user report of the environmental data", including data such as "the presence of viable microbiological organisms, the presence of particulates and other environmental conditions[,] . . . and the respective amounts of different materials involved in the manufacture of the end product(s)."  Levinson at 1.

[5] Each of these prior art references are also listed on the face of the '020 Patent and the '810 Patent.  See Def.'s 56(a)2 Stmt. ¶ 8; '020 Patent; '810 Patent.

Def.'s 56(a)2 Stmt. ¶ 8; '788 Patent.  Of the claims asserted by CM for the '788 Patent, only Claim 1 is an independent claim; Claims 2-3, 5-8, and 19 "all depend directly or indirectly on Claim 1".  Pl.'s LR 56(a)2 Stmt. ¶¶ 2-3; '788 Patent.

The '020 Patent, a continuation-in-part of the '788 patent, was filed on November 6, 2017.  Def.'s LR 56(a)2 Stmt. ¶ 18; '020 Patent at 1.  During prosecution of the '020 Patent, the USPTO issued "a non-final Office action . . . on August 22, 2019, rejecting all pending claims (Claims 1-19) based on non-statutory double-patenting", to which the "[a]pplicants responded by filing an amendment cancelling all pending claims and adding new claims 20-39[.]"  Pl.'s LR 56(a)2 Stmt. ¶ 16; accord Remarks, Def.'s Ex. 9 to Cohen Decl. (Doc. No. 199-24).  On April 22, 2020, the USPTO issued another action "rejecting Claims 20-30 under 35 U.S.C. § 101 as being directed to a judicial exception"—i.e., non-statutory subject matter.  Pl.'s LR 56(a)2 Stmt. ¶ 17.  In response, on August 24, 2020, the applicants filed a request for continued examination "amending application Claims 20, 34 and 39 to include the limitation that temperature data is 'wirelessly communicated from the . . . stationary sensor to the handheld computing device.'"  Id.; accord Request for Continued Examination of '020 Patent ("Request for Continued Examination"), Def.'s Ex. 10 to Cohen Decl. (Doc. No. 199-25).  On September 15, 2020, the USPTO issued another non-final action "withdr[awing] the rejections of all pending claims (Claims 19-30) . . . due to [the] [a]pplicants' amendments", and "[a]pplication Claims 20, 34, and 39 [were then] issued as Claims 1, 15 and 20", respectively, of the '020 Patent.  Id. at ¶¶ 19-20; accord Continued Examination, Def.'s Ex. 12 to Cohen Decl., at 3-4 (Doc. No. 199-27); Index of Claims, Def.'s Ex. 13 to Cohen Decl. (Doc. No. 199-28).  The '020 Patent was issued on May

11, 2021.  See '020 Patent.  Of the claims in the '020 Patent, only Claims 1, 15, and 20 are independent claims—Claims 2-14 depend directly or indirectly on Claim 1 and Claims 16-19 depend directly or indirectly on Claim 15.  Pl.'s LR 56(a)2 Stmt. ¶¶ 5-7; '020 Patent.

The '810 Patent, a continuation of the '020 Patent and a continuation-in-part of the '788 Patent, was filed on May 3, 2021.  Def.'s LR 56(a)2 Stmt. ¶ 22; '810 Patent at 1.  The '810 Patent was issued on September 20, 2022.  See '810 Patent.  Of the claims in the '810 Patent, only Claims 1, 15, and 20 are independent claims—Claims 2-14 depend directly or indirectly on Claim 1 and Claims 16-19 depend directly or indirectly on Claim 15.  Pl.'s LR 56(a)2 Stmt. ¶¶ 9-11; '810 Patent.

## 2. Accused Products

TransAct makes and sells food service-related products, in the form of various hardware and software components, under the brand name "BOHA!".  See Declaration of Brent Richtsmeier ("Richtsmeier Decl."), at ¶ 4 (Doc. No. 199-3).  These products include, but are not limited to, the "BOHA! Control Center, BOHA! Handheld, BOHA! Workstation, BOHA! Terminal, BOHA! Terminal with CrunchTime, BOHA! Checklist, BOHA! Food Prep, BOHA! Inventory, BOHA! Ops, BOHA! Sense, BOHA! Temp, BOHA! Timer, BOHA! Sensor, BOHA! Gateway, and related services, including but not limited to service contracts and extended warranties . . . ."  See, e.g., Plaintiff's Supplemented Disclosure of Asserted Claims and Infringement Contentions ("Pl.'s Suppl. Disclosure"), Def.'s Ex. 4 to Cohen Decl., at 2 (Doc. No. 199-19); BOHA! Control Center Account Management User Guide ("BOHA! Control Center Guide"), Def.'s Ex. 1 to Richtsmeier Decl. (Doc. No. 199-4); BOHA! Work Station Quick Start Guide, Def.'s Ex. 2 to

Richtsmeier Decl. (Doc. No. 199-5); BOHA! Terminal Quick Start Guide, Def.'s Ex. 3 to Richtsmeier Decl. (Doc. No. 199-6).  CM has identified these products (hereinafter "Accused Products") as infringements of the '788, '020, and '810 Patents.  See Pl.'s Suppl. Disclosure at 2-3.

The parties dispute the various functions and features of the Accused Products. TransAct states that, of the Accused Products, "only BOHA! Temp, BOHA! Checklist, BOHA! Sense . . . and BOHA! Handheld[,] along with third-party handheld temperature sensors . . . are used in connection with BOHA! Control Center to provide a solution to manage the temperature of equipment and food",[6] see Defendant's Local Rule 56(a)1 Statement ("Def.'s LR 56(a)1 Stmt.") ¶ 36 (Doc. No. 199-2), and it further asserts that the other Accused Products "have nothing to do with temperature data and nothing to do with a stationary sensor."[7]  Id. at ¶ 37.  CM, however, disputes TransAct's assertion that the other Accused Products "have nothing to do with temperature data" and asserts that temperature data is accessible and viewable via the BOHA! Ops application, "which

---

[6] TransAct has described each of these Accused Products as follows: BOHA! Temp is a software application including a checklist feature; BOHA! Checklist is a module within BOHA! Ops, a software application; BOHA! Sense is a "combined solution that includes BOHA! Sensor(s)"—i.e., temperature sensors—"and BOHA! Gateway hardware"—i.e., a router that receives data; and BOHA! Handheld is a handheld computing device.  See Defendant's Local Rule 56(a)1 Statement ("Def.'s LR 56(a)1 Stmt.") ¶¶ 36, 47 (Doc. No. 199-2); Richtsmeier Decl. ¶¶ 6-7.  In its Local Rule 56(a)2 Statement, CM does not appear to dispute these descriptions of each of these BOHA! Products.  See Pl.'s LR 56(a)2 Stmt. ¶¶ 36, 47.  As such, these Statements of Fact are deemed admitted.  See D. Conn. L. Civ. R. 56(a)(2)(i)-(3).

[7] These Accused Products—which, TransAct asserts, are unrelated to temperature management—consist of the BOHA! Workstation, which is a printer; BOHA! Terminal, which is also a printer; BOHA! Terminal with CrunchTime, which is hardware with CrunchTime software pre-installed; BOHA! Inventory, which is a software application; BOHA! Ops, which is also a software application; BOHA! Timer, which is a module within BOHA! Ops; and BOHA! Food Prep, which is also a module within BOHA! Ops.  See Def.'s LR 56(a)1 Stmt. ¶ 37.  In its Local Rule 56(a)2 Statement, CM does not appear to dispute these descriptions of each of these BOHA! Products.  See Pl.'s LR 56(a)2 Stmt. ¶ 36.  As such, these Statements of Fact are deemed admitted.  See D. Conn. L. Civ. R. 56(a)(2)(i)-(3).  However, CM does dispute TransAct's assertion that these products are entirely unrelated to temperature management. See Pl.'s LR 56(a)2 Stmt. ¶ 37.

is available on" the BOHA! Terminal and BOHA! Workstation.  See Pl.'s LR 56(a)2 Stmt. ¶¶ 37, 41.  The parties also dispute, inter alia, whether (1) the BOHA! Control Center, when executed on a server, "cause[s]" the server to send checklists to the BOHA! Handheld; (2) the BOHA! Control Center, when executed on a server, "cause[s]" the server to obtain checklist responses from the BOHA! Handheld; and (3) the BOHA! Sensors wirelessly communicate temperature data to the BOHA! Handheld.  See Pl.'s LR 56(a)2 Stmt. ¶¶ 42-43, 46-47; Def.'s LR 56(a)1 Stmt. ¶¶ 42-43, 46-47.

> B.    Procedural Background

On May 3, 2022, CM filed its initial Complaint in this action.  See Complaint (Doc. No. 1).  CM filed a Supplemented Complaint on October 18, 2022.  See Suppl. Compl. On November 1, 2022, TransAct filed its Answer to CM's Supplemented Complaint, along with its affirmative defenses and multiple counterclaims seeking a declaration of noninfringement as to each of the Asserted Patents.  See Answer.  TransAct filed its first Motion for Summary Judgment on November 21, 2022, see TransAct's Motion for Summary Judgment of Non-Infringement ("Def.'s Prior Mot.") (Doc. No. 66), which the court subsequently terminated, without prejudice, to allow TransAct to file a new Motion for Summary Judgment that "include[s] arguments and evidence from its first Motion alongside new material on Invalidity."  See Order (Doc. No. 198).

On April 10, 2023, the parties filed their claim construction briefs.  See CM's Opening Brief on Claim Construction (Doc. No. 124); TransAct's Opening Claim Construction Brief (Doc. No. 125).  TransAct filed its new Motion for Summary Judgment on July 5, 2023, see Def.'s Summ. J. Mot., which CM opposes, see Plaintiff's Response in Opposition to Summary Judgment ("Pl.'s Summ. J. Opp.") (Doc. No. 218).

8

CM filed its own Motion for Summary Judgment on July 5, 2023, <u>see</u> Pl.'s Summ. J.
Mot., which TransAct opposes, <u>see</u> TransAct's Opposition to CM's Motion for Summary
Judgment ("Def.'s Summ. J. Opp.") (Doc. No. 212).

On February 15, 2024, the court issued its Claim Construction Ruling.  <u>See</u> Claim
Construction Ruling (Doc. No. 240).  The court also issued an Order granting the parties
leave to file renewed Motions for Summary Judgment as to invalidity (or validity) and
infringement (or noninfringement) of the '810 Patent to address the issue of whether the
term "base station device", as it is used in the '810 Patent, is indefinite.  <u>See</u> Order
(Doc. No. 241).

## III.    LEGAL STANDARD

A motion for summary judgment may be granted only when the moving party can
establish that "there is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>Anderson v. Liberty
Lobby, Inc.</u>, 477 U.S. 242, 256 (1986); <u>Wright v. N.Y. State Dep't of Corr.</u>, 831 F.3d 64,
71-72 (2d Cir. 2016).  If the moving party satisfies this burden, the nonmoving party
must set forth specific facts demonstrating that there is indeed "a genuine issue for
trial."  <u>Wright v. Goord</u>, 554 F.3d 255, 266 (2d Cir. 2009).  A genuine issue exists where
"the evidence is such that a reasonable jury could return a verdict for the nonmoving
party."  <u>Cross Com. Media, Inc. v. Collective, Inc.</u>, 841 F.3d 155, 162 (2d Cir. 2016).
Unsupported allegations do not create a material issue of fact and cannot overcome a
properly supported motion for summary judgment.  <u>See</u> <u>Weinstock v. Columbia Univ.</u>,
224 F.3d 33, 41 (2d Cir. 2000).  In assessing the record to determine whether there are
disputed issues of material fact, the trial court must "resolve all ambiguities and draw all

inferences in favor of the party against whom summary judgment is sought." LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995).

When, as here, both parties come before the court on cross-motions for summary judgment, the court is not required to grant judgment as a matter of law for either side. See Ricci v. DeStafano, 530 F.3d 88, 109-10 (2d Cir. 2008). "Rather the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Id. at 110.

## IV.   DISCUSSION

### A.   Motions for Summary Judgment

TransAct has moved for summary judgment as to noninfringement of all three Asserted Patents and as to the invalidity of the '788 Patent. See Def.'s Summ. J. Mot. CM has moved for summary judgment as to the validity of all three Asserted Patents and as to infringement of Claim 1 of the '810 Patent. See Pl.'s Summ. J. Mot. Because the court has granted the parties leave to file renewed Motions for Summary Judgment as to the '810 Patent, see Order (Doc. No. 241), this Ruling only addresses the arguments of plaintiff and defendant pertaining to the validity (or invalidity) and noninfringement of the '788 and '020 Patents.

#### 1.   Validity of the Asserted Claims of the '788 Patent and '020 Patent

CM and TransAct have cross-moved for summary judgment as to whether the various asserted Claims of the '788 Patent are valid. See TransAct's Memorandum of Law in Support of Motion for Summary Judgment ("Def.'s Summ. J. Mem."), at 31-36 (Doc. No. 199-1); Unredacted Brief in Support of Plaintiff's Motion for Summary

Judgment on Validity and Infringement ("Pl.'s Summ. J. Mem."), at 4-12 (Doc. No. 207).[8]

CM has also moved for summary judgment of validity as to the '020 Patent, <u>see</u> Pl.'s

Summ. J. Mem. at 12-16, which TransAct opposes, <u>see</u> Def.'s Summ. J. Opp. at 11-13.

A patent is presumed valid, and "[e]ach claim of a patent (whether in

independent, dependent, or multiple dependent form) [is] presumed valid independently

of the validity of other claims[.]"  35 U.S.C. § 282(a).  The party asserting invalidity bears

the burden of proving, by clear and convincing evidence, that the patent is invalid.  <u>See</u>

<u>Microsoft Corp. v. I4I Ltd. P'ship</u>, 564 U.S. 91, 97-98 (2011).  "Thus, a moving party

seeking to invalidate a patent at summary judgment must submit such clear and

convincing evidence of invalidity so that no reasonable jury could find otherwise."  <u>Eli</u>

<u>Lilly & Co v. Barr Labs, Inc.</u>, 251 F.3d 955, 962 (Fed. Cir. 2001).  "Alternatively, a

moving party seeking to have a patent held not invalid at summary judgment must show

that the nonmoving party . . . failed to produce clear and convincing evidence on an

essential element of a defense upon which a reasonable jury could invalidate the

patent."  <u>Id.</u>

a)      Indefiniteness and Lack of Written Description

CM has moved for summary judgment as to the definiteness of various claim

terms in the '788 and '020 Patents.  CM also moves for a ruling that two of these claim

terms—"data encoding each checklist" and "management portal application"—meet the

written description requirement.  In addition, CM has moved for summary judgment that

---

[8] In its Motion for Summary Judgment, TransAct asks the court to hold Claim 20 of the '788 Patent invalid because Claim 20 fails to "specify any further limitation of the subject matter claimed in parent Claim 1."  <u>See</u> Def.'s Summ. J. Mem. at 36.  However, in its Opposition, CM has confirmed that it is not asserting Claim 20 of the '788 Patent.  <u>See</u> Pl.'s Summ. J. Opp. at 31-32.  Because Claim 20 of the '788 Patent is not at issue in this litigation, the court will not rule on its validity.

Claim 19 of the '788 Patent complies with the written description requirement.  To grant CM's Motion, the court must determine whether CM has shown that TransAct has failed to produce clear and convincing evidence upon which a reasonable jury could invalidate the patent.  Eli Lilly, 251 F.3d at 962.  The court must view the evidence in the light most favorable to TransAct, the nonmoving party, and resolve all doubts in its favor.  See Anderson, 477 U.S. at 255.

(1)     Analysis of Claim Terms

As an initial matter, CM asserts that, contrary to TransAct's invalidity contentions, see TransAct's First Amended Invalidity Contentions ("Def.'s Invalidity Contentions"), Pl.'s Ex. D (Doc. No. 206-6), the following terms, present in one or more of the Asserted Patents—"time interval has not been completed", "future temperature data and future food temperature data", "management portal application", "data encoding each checklist", and "data encoding the checklist"— are not indefinite.[9]  A claim is indefinite if, "read in light of the specification . . . and the prosecution history, [it] fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. 898, 901 (2014).  "Indefiniteness must be proven by clear and convincing evidence."  Sonix Tech. Co. v. Publ'ns Int'l, Ltd., 844 F.3d 1370, 1377 (Fed. Cir. 2017).

In its Opposition, TransAct does not directly respond to CM's validity arguments as to these terms, opting to defer responding to CM's arguments "until during (or after)

---

[9] Here, the court does not address CM's Motion as to the validity of the term "base station device"—which is used exclusively in the '810 Patent—because it believes additional argument as to the validity (or invalidity) of that term is necessary.  Accordingly, as discussed above, the court has granted plaintiff and defendant leave to file renewed Motions for Summary Judgment as to the '810 Patent.  See Order (Doc. No. 241).

claim construction."  See Def.'s Summ. J. Opp. at 10-12.  Nonetheless, the court

concludes that an assessment of definiteness of these claim terms is warranted, at this

juncture, based on this court's claim construction, the Markman hearing, and the

evidence presented to the court by both parties in their respective summary judgment

Motions.

CM similarly moves for summary judgment on the ground that the terms

"management portal application" and "data encoding each checklist" comply with the

written description requirement.  See Pl.'s Summ. J. Mem. at 13-15.  The written

description requirement arises out of Section 112 of title 35 of the United States Code,

which provides that "[t]he specification shall contain a written description of the

invention[.]"  35 U.S.C. § 112(a).  To satisfy the requirement, the description of the

invention "must clearly allow persons of ordinary skill in the art to recognize that [the

inventor] invented what is claimed."  In re Alton, 76 F.3d 1168, 1172 (Fed. Cir. 1996).

"Compliance with the written description requirement is a question of fact but is

amenable to summary judgment in cases where no reasonable fact finder could return a

verdict for the non-moving party."  PowerOasis, Inc. v. T-Mobile USA, Inc., 522 F.3d

1299, 1307 (Fed. Cir. 2008).  Given this standard, the court must determine, in light of

TransAct's invalidity contentions, whether each term's compliance with the written

description requirement is amenable to summary judgment, before determining whether

the terms do, indeed, comply with the requirement.

        (a)     "Time Interval Has Not Been Completed" and "Future Temperature Data and Future Food Temperature Data"

In its Claim Construction Ruling, the court concluded that the term "time interval has not been completed", as used in the '788 Patent, has a clear plain and ordinary meaning that required no further construction, and it agreed with TransAct that "future temperature data and future food temperature data" should be construed to mean "temperature data and food temperature data for a time after the time interval."  See Claim Construction Ruling at 21-23.  Based on the intrinsic evidence before the court, including the written description, as well as this court's claim construction analysis, see id., the court sees no reason as to why either of these terms are not "precise enough to afford clear notice of what is claimed".  See Nautilus, 572 U.S. at 910.  Nor has TransAct offered any argument as to why these terms may be indefinite.  The court therefore concludes that the terms are not invalid as indefinite.

        (b)     "Data Encoding Each Checklist" and "Data Encoding the Checklist"

In its Claim Construction Ruling, the court construed the term "data encoding each checklist" as "each checklist that is converted into a coded form for transmission", and it determined that the intrinsic evidence provided a clear basis for the term's meaning and construction.  See Claim Construction Ruling at 12-13.  TransAct has not provided any evidence to demonstrate that the term "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  Nautilus, 572 U.S. at 901.  In addition, the court has already explicitly ruled in its Claim Construction Ruling, in response to TransAct's arguments, that the term "data encoding the checklist" is not invalid as indefinite.  See Claim Construction Ruling at 13-16.   Accordingly, the court

holds that both terms—"data encoding each checklist" and "data encoding the checklist"—are not invalid as indefinite.

In its invalidity contentions, TransAct asserts that "Claims 1-20 [of the '020 Patent] are . . . invalid under 35 U.S.C. § 112 for lack of written description because there is no support in the '020 Patent specification for 'data encoding each checklist.'" See Def.'s Invalidity Contentions at 6.  In its Motion for Summary Judgment, CM asks the court to reject this invalidity contention.  See Pl.'s Summ. J. Mem. at 13-14. However, the court declines to rule, at least at this juncture, that the term "data encoding each checklist" satisfies the written description requirement.  The Federal Circuit has emphasized that "[c]ompliance with the written description requirement is essentially a fact-based inquiry", Enzo Biochem, Inc. v. Gen-Probe Inc., 323 F.3d 956, 963 (Fed. Cir. 2002), and is therefore only amenable to summary judgment where no reasonable factfinder could find in favor of the nonmoving party, see PowerOasis, 522 F.3d at 1307.  In its Memorandum, CM does not provide any evidence from the specification in support of its argument that "data encoding each checklist" complies with the written description requirement.  See Pl.'s Summ. J. Mem. at 13-14.  On this record, the court cannot say that no reasonable jury could find that "data encoding each checklist" lacks support in the specification and therefore renders Claims 1 to 20 of the '020 Patent invalid for lack of written description.  Summary judgment in CM's favor is, therefore, inappropriate.  Accordingly, the court denies CM's Motion with respect to its argument that the term "data encoding each checklist" does not violate the written description requirement.

(c)    "Management Portal Application"

During claim construction, the court construed "management portal application" to mean "portal application that provides an interface for management users to manage checklists."  <u>See</u> Claim Construction Ruling at 9-12.  The court noted that the term itself is idiosyncratic, <u>see id.</u> at 10, but it nonetheless concluded that the intrinsic evidence, including the written description, provided a clear basis for its meaning and its construction.  <u>See id.</u> at 9-12.  Once again, the court sees no reason why the term, as construed, "read in light of the specification . . . fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  <u>Nautilus</u>, 572 U.S. at 901.  It therefore holds that the term "management portal application" is not invalid as indefinite.

In its invalidity contentions, TransAct asserts that "Claims 1-19 [of the '020 Patent] are . . . invalid under 35 U.S.C. § 112 for lack of written description because there is no support in the '020 Patent specification for 'management portal application.'" <u>See</u> Def.'s Invalidity Contentions at 6.  In its Motion, however, CM cites the following segment from the '020 Patent's specification:

> A corporate management user for a plurality of food service establishments may access a corporate management portal 403 through the web portal application 324 (FIG. 3).  In some embodiments, the corporate management portal 403 is the same application as the web portal application 324 but with behavior specific to corporate management users, or "super users," configured in user data 339 (FIG. 3). In other embodiments, the corporate management portal 403 includes an entirely separate application executed on different servers 124 (FIG. 1).

'020 Patent at 8:5-8:15 (diagram numbers included).  The specification then details how "master checklists may be further configured at each of a plurality of regional

management portals", id. at 8:23-8:24, and it goes on to extensively describe said "regional management portals", id. at 8:24-8:53.

In its Opposition, TransAct does not raise any arguments to dispute CM's argument that the term has support in the specification.  See Def.'s Summ. J. Opp. at 12.  Indeed, the court agrees with CM that, contrary to TransAct's contentions, the specification provides clear and extensive support for the term, as construed by this court.  See Claim Construction Ruling at 9-12 (construing "management portal application" as "portal application that provides an interface for management users to manage checklists").   Although the court remains mindful that compliance with the written description requirement is generally a question of fact that is only amenable to summary judgment where no reasonable factfinder could find in favor of the nonmoving party, see PowerOasis, 522 F.3d at 1307, it concludes that, here, the specification clearly meets the written description requirement, and TransAct has not come forward with any evidence or argument to the contrary that raises a genuine issue of material fact.  Based on the evidence before it, the court concludes that no reasonable jury could find in favor of TransAct's contention that Claims 1 to 19 of the '020 Patent are invalid for lack of written description due to lack of support in the specification for "management portal application".  Accordingly, the court grants CM's Motion with respect to its argument that the term "management portal application" does not violate the written description requirement.

(d)     Summary

In sum, based on the evidence currently before the court, the court cannot conclude that the above terms, as used in the '788 Patent and '020 Patent—"time

17

interval has not been completed", "future temperature data and future food temperature data", "data encoding each checklist", "data encoding the checklist", and "management portal application"—"fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." Nautilus, 572 U.S. at 901. The court therefore holds that the above claim terms of the '788 Patent and '020 Patent are not invalid as indefinite. Plaintiff's Motion for Summary Judgment of validity, with respect to the definiteness of the above claim terms, is granted. Plaintiff's Motion that the term "management portal application" complies with the written description requirement is also granted. Plaintiff's Motion that "data encoding each checklist" complies with the written description requirement is denied.

(2)    Claim 19 of the '788 Patent's Compliance with the Written Description Requirement

CM has also moved for summary judgment that Claim 19 of the '788 Patent satisfies the written description requirement. See Pl.'s Summ. J. Mem. at 12. As noted above, to meet the requirement, the description of the invention "must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." In re Alton, 76 F.3d at 1172. Here, the court cannot say that no reasonable factfinder could find that Claim 19 fails to comply with the written description requirement. The Claim language recites "a map displaying a status indicator at a geographic location of each of at least one of the food service establishments, the status indicator selected based at least in part on the responses associated with the respective food service establishment." See '788 Patent at 22:11-22:15. CM argues that the following specification provides support for the limitation that the "status

18

indicator" is "selected based at least in part on the responses associated with the respective food service establishment":

> Status indicators 1312 may each indicate a plurality of statuses 1315 for each food service establishment. The statuses 1315 may be color coded, pictorial, blinking, textual, and/or provide some other way for a user to ascertain visually the compliance status of the food service establishment. In one embodiment, three statuses 1315 are provided in each status indicator 1312, the statuses 1315 respectively representing diagnostic data, automatically gathered checklist responses 312, and manually gathered checklist responses 312.

Id. at 11:57-11:66 (diagram numbers included). As TransAct correctly notes, however, the specification does not provide clear explanation as to how status indicators are selected; it merely describes how "statuses" are "provided in each status indicator." See id. CM has provided no other evidence, beyond this portion of the specification, demonstrating that Claim 19 has the requisite written description. Accordingly, the court cannot conclude that CM has shown that TransAct has failed to adduce clear and convincing evidence upon which a reasonable jury could find that Claim 19 lacks the requisite written description. CM's Motion for Summary Judgment as to Claim 19's compliance with the written description requirement is therefore denied.

b)      Obviousness

CM and TransAct have cross-moved for summary judgment as to whether the Asserted Claims of the '788 Patent are invalid as obvious over prior art references Mobley, Kates, Dillard, and Levinson, and CM has also moved for summary judgment as to whether the Asserted Claims of the '020 Patent are valid as nonobvious.

Whether a Patent is invalid as obvious over prior art references "is a question of law based on underlying questions of fact." Green Edge Enters., LLC v. Rubber Mulch Etc., LLC, 620 F.3d 1287, 1298 (Fed. Cir. 2020). "The underlying factual inquiries

include: (1) 'the scope and content of the prior art'; (2) 'differences between the prior art and the claims at issue'; (3) 'the level of ordinary skill in the pertinent art'; and (4) relevant objective considerations, including 'commercial success, long felt but unsolved needs, [and] failure of others . . . .'" Plantronics, Inc. v. Aliph, Inc., 724 F.3d 1343, 1353 (Fed. Cir. 2013) (quoting KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 406 (2007)). "The ultimate judgment of obviousness is a legal determination[,]" such that when "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate." KSR, 550 U.S. at 427. Obviousness must be proven by clear and convincing evidence. See Galderma Labs., L.P. v. Tolmar, Inc., 737 F.3d 731, 736 (Fed. Cir. 2013).

To prevail on a Motion for Summary Judgment that a Patent is nonobvious, a movant has the burden of showing that the nonmovant "failed to come forth with clear and convincing evidence of an essential element of its prima facie case of obviousness." Duramen Pharms., Inc. v. Watson Labs., Inc., 413 Fed. App'x 289, 295 (Fed. Cir. 2011). "[T]he inquiry on summary judgment is whether a jury applying the clear and convincing evidence standard could reasonably find, based on the evidence produced by the accused infringer, that the claimed invention was obvious." Plantronics, 724 F.3d at 1353.

                (1)     Whether the '788 Patent Is Nonobvious Over the Prior Art

Because both parties have moved for summary judgment as to the obviousness or nonobviousness of the '788 Patent, the court must take care to evaluate each Motion on its own merits. See Ricci, 530 F.3d at 110. As such, the court analyzes the Motions

separately.  First, the court will assess whether TransAct has met its burden of

demonstrating, by clear and convincing evidence, that the '788 Patent is obvious and

that TransAct is therefore entitled to summary judgment as a matter of law.  If TransAct

has not done so, the court will then determine whether CM has shown that TransAct

has "failed to come forth with clear and convincing evidence of an essential element of

its prima facie case of obviousness" such that CM is entitled to summary judgment of

validity.  Duramen Pharms., 413 Fed. App'x at 295.  The court notes that both parties

largely rely on the same evidence and arguments in their respective Motions.

> (a)  TransAct's Motion for Summary Judgment of
> Obviousness Is Denied Because the '788
> Patent Is Not Obvious over the Prior Art as a
> Matter of Law

TransAct urges this court to hold that the '788 Patent is invalid as obvious under

35 U.S.C. § 103 over prior art references Mobley, Kates Dillard, and Levinson.[10]

TransAct relies on the January 12, 2017 appeal decision by the PTAB, which rejected

the independent application claims of the '788 Patent as obvious over Mobley, Kates

and Dillard but nonetheless found nonobvious the limitation in application Claim 4 that

the "web portal application" can "generate a report for each food service establishment

including at least the respective temperature data and respective food temperature for a

time interval", wherein "the time interval has not been completed and the report includes

a plurality of regions for future temperature data and future food temperature data".  See

Decision on Appeal at 12-13.  This feature, TransAct contends, is actually present in

---

[10] TransAct also maintains that the '788 Patent may be invalid as obvious over Subway, another
related Patent.  See Def.'s Summ. J. Opp. at 3.  However, to date, TransAct has been unable to
authenticate the filing date of Subway.  Id.  It has thus informed the court that it "does not currently intend
to rely on Subway" for its invalidity arguments.  Id.

Levinson.  See Def.'s Summ. J. Mem. at 34-35.  In support of its argument, TransAct

cites the written opinion on plaintiff's PCT Application, wherein the examiner found that:

> [Application Claim 4] specifically disclose[s] that the time interval has not been
> completed and the report includes a plurality of regions for future temperature
> data and future food temperature data.  Levinson discloses creating report
> templates for future data collection (para [0041]).  Additionally, it is well known in
> the art of report generation to provide interim reports using partially completed
> template forms (i.e., it is well known to provide semi-annual reports on partially
> completed annual report templates).  A person skilled in the art would have been
> motivated to further modify the system of Mobley in accordance with the
> teachings of Levinson such that the time interval has not been completed and the
> report includes a plurality of regions for future temperature data and future food
> temperature data, since it would provide the data in a traditional format.

See id. at 35 (quoting PCT Opinion at 5).

In its Opposition, CM argues that this court may not consider Levinson because

TransAct failed to timely disclose its reliance on Levinson for its invalidity arguments, in

violation of this court's Scheduling Order.  See Pl.'s Summ. J. Opp. at 28.  CM further

contends that, even if this court were to consider Levinson, the court should still hold

that the '788 Patent is nonobvious over Levinson and other prior art references because

(1) Levinson is listed on the face of the Asserted Patent, meaning the Patent examiner

is presumed to have considered it; (2) the relevant limitation is not actually present in

Levinson, despite the PCT examiner's conclusion to the contrary; and (3) Levinson is

directed to a different field than the food preparation industry of the Asserted Patents.

Id. at 29-31.

As a threshold matter, the court declines to exclude Levinson from its

consideration.  It is undisputed by the parties that Levinson—which was issued before

the filing of the '788 Patent application and is listed on the face of the '788 Patent—

constitutes prior art.  See '788 Patent; Levinson, Def.'s Ex. 15 to Cohen Decl. (Doc. No.

199-30).  Although the parties agreed to follow the Northern District of California's

Patent Rules for certain scheduling deadlines, <u>see</u> Minute Entry (Doc. No. 37), the

court's operative Scheduling Order does not expressly require the parties to adhere to

the Northern District of California's Patent Rules, <u>see</u> Scheduling Order (Doc. No. 62).

The court's obligation to ensure that this case comes to a fair and correct resolution

further warrants its consideration of Levinson.

In turn, it is undisputed by the parties that the aforementioned prior art, including

Levinson, appears on the face of the '788 Patent.  <u>See</u> '788 Patent at 2.  Therefore, "the

[patent] examiner is presumed to have considered it."  <u>Shire LLC v. Amneal Pharms.,</u>

<u>LLC</u>, 802 F.3d 1301, 1307 (Fed. Cir. 2015).  TransAct thus has "the added burden of

overcoming the deference that is due to a qualified government agency presumed to

have properly done its job, which includes one or more examiners who are assumed to

have some expertise in interpreting the references and to be familiar from their work

with the level of skill in the art and whose duty it is to issue only valid patents."

<u>PowerOasis, Inc. v. T-Mobile USA, Inc.</u>, 522 F.3d 1299, 1304 (Fed. Cir. 2008) (quoting

<u>Am. Hoist & Derrick Co. v. Sowa & Sons</u>, 725 F.2d 1350, 1360 (Fed. Cir. 1984)).

As noted above, before determining the legal issue of obviousness, the court

must look at the underlying facts, including the level of ordinary skill in the art, the scope

and content of the relevant reference in Levinson, and the scope of the '788 Patent

claims.  Here, the parties do not dispute that the applicable level of ordinary skill in the

art is an individual with a Bachelor of Science degree in computer science with several

years of experience working with computer systems and applications.  <u>See</u> Def.'s

Summ. J. Mem. at 32-33; <u>accord</u> Pl.'s Summ. J. Opp. at 26-31 (not contesting

TransAct's assessment of the applicable level of ordinary skill in the art).

Next, the court turns to the scope and content of the prior art.  Here, much of the parties' disagreement hinges on whether the limitation in application Claim 4 of the '788 Patent—which eventually became part of independent Claim 1 of the Patent—is present in Levinson.  Having reviewed paragraphs 41 and 49 of Levinson,[11] the court agrees with CM that paragraphs 41 and 49 of Levinson do not contain the same limitation as the limitation in application Claim 4, i.e., independent Claim 1 of the '788 Patent.  Paragraph 41 of Levinson describes a "reports application" where "the retrieval of entered environmental monitoring data is accomplished."  See Levinson at ¶ 41.  As part of this application:

> [A] user can manipulate a "report creation wizard' allowing the user to select the type of report to generate (i.e. line graph, bar graph, tabular, etc.), the date range for the report, the data fields to search by within the report (i.e. personnel, product lot, result condition, etc.), and the sorting/grouping for the format of the report.  The user can then save the created report "template" for future data retrieval.

Id. (emphasis added).  The same limitation regarding "future data retrieval" is described in paragraph 49 of Levinson.  See id. at ¶ 49 (describing how "[t]he user is able to use a 'report creation wizard' to select the type of report to generate" and "[a]fter the creation of the report 'template' the user is able to save the created report for future data retrieval").

Although the PCT Written Opinion is correct that Levinson discloses a system of creating and saving report templates for future data retrieval, this disclosure is, on its face, materially distinct from the relevant limitation in application Claim 4 of the '788

---

[11] The PCT Examiner's Opinion cites paragraph 41 of Levinson as the relevant limitation.  See PCT Opinion at 5.  As TransAct correctly notes, paragraph 49 of Levinson contains a similar limitation.  See Levinson at ¶ 49 ("After the creation of the report template the user is able to save the created report for future data retrieval.").

Patent.  That limitation recites a system of report generation in which the relevant data is displayed for a time interval, "wherein the time interval has not been completed" and the report includes a "plurality of regions" for temperature data and food temperature data for a time after the time interval.  See Decision on Appeal at 12-13; '788 Patent at 18:65-19:3; Claim Construction Ruling at 21-23 (construing "future temperature data and future food temperature data" as "temperature data and food temperature data for a time after the time interval").  In other words, it discloses a particular form of reporting in which the report (1) displays collected temperature data and (2) includes additional regions for future data.  Levinson, by contrast, only describes how report "templates" can be customized and then "save[d] . . . for future data retrieval."  See Levinson at ¶ 41.  The court therefore cannot conclude, from the evidence proffered, that the limitation in application Claim 4 is, indeed, disclosed in Levinson.

In turn, the court concludes that TransAct has not proffered "clear and convincing" evidence of obviousness sufficient to warrant summary judgment in its favor.  While the PCT Written Opinion is undoubtedly relevant to the obviousness assessment, it does not—by itself—constitute clear and convincing evidence of obviousness, particularly given this court's conclusion that the relevant feature is not, in fact, disclosed in Levinson.  TransAct has provided no other evidence, beyond the PCT Written Opinion—such as expert testimony—that it would have been obvious to a person of ordinary skill in the art to arrive at the patented technology of the '788 Patent by combining the teachings of Levinson with that of Mobley, Kates, and Dillard, or by combining the teachings of any other prior art.   A court may only grant summary judgment of obviousness when "the content of the prior art, the scope of the patent

25

claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors . . . ."  KSR, 550 U.S. at 427.  Here, TransAct has not met that heavy burden.  The defendant's Motion for Summary Judgment of obviousness as to the '788 Patent is therefore denied.

          (b)     CM's Motion for Summary Judgment of Nonobviousness of the '788 Patent Is Granted Because TransAct Has Not Put Forth Clear and Convincing Evidence upon Which a Reasonable Jury Could Find the '788 Patent Obvious over the Prior Art

In its own Motion for Summary Judgment of nonobviousness as to the '788 Patent, CM contends that TransAct has "failed to produce clear and convincing evidence on an essential element of a defense upon which a reasonable jury could invalidate the patent."  See Pl.'s Summ. J. Mem. at 4 (quoting Eli Lilly, 251 F.3d at 962).

As discussed above, having reviewed Levinson, the court agrees with CM that Levinson, on its face, does not disclose the limitation that ultimately rendered the '788 Patent nonobvious over Mobley, Kates, and Dillard.  The PCT Application, by itself, is insufficient to constitute clear and convincing evidence that the '788 Patent is obvious over Levinson, Mobley, Kates, and Dillard, particularly because the relevant limitation is not present in Levinson.  And, as noted above, TransAct has not proffered any other evidence that it would have been obvious to combine Levinson with Mobley, Kates, and Dillard, or to combine any other prior art.

Thus, the court concludes that TransAct has not adduced evidence sufficient to make its prima facie case of obviousness, create a genuine issue of material fact, and survive summary judgment.  See, e.g., Unigene Labs., Inc. v. Apotex Inc., No. 06-CV-5571, 2009 WL 2762706, at *8-10 (S.D.N.Y. Aug. 31, 2009), aff'd in part, rev'd in part

26

on other grounds, 655 F.3d 1352 (Fed. Cir. 2011) (concluding that the defendant had failed to raise a genuine issue of material fact, in part, because particular features of the asserted patent were not present in the prior art).

The court reiterates that TransAct's evidentiary burden is all the weightier because the patent examiner is presumed to have considered all prior art listed on the face of the Patent, including Levinson and the PCT Written Opinion.  See Shire, 802 F.3d at 1307 (noting that a patent examiner is "presumed to have considered" prior art "listed on the face of the patents-in-suit"); accord Hewlett-Packard Co. v. Bausch & Lomb Inc., 909 F.2d 1464, 1467 (Fed. Cir. 1990) (noting that a challenger's burden of proving obviousness "is especially difficult when the prior art was before the PTO examiner during prosecution of the application").  Here, the undisputed evidence from the prosecution history shows that plaintiff disclosed, in an Information Disclosure Statement, not only Levinson, but also the PCT Written Opinion that cites Levinson.[12] The examiner ultimately concluded, with all that information available to him or her, that the Patent application warranted approval.  TransAct has not provided sufficient

---

[12] In its moving papers, TransAct contends that, although plaintiff disclosed Levinson, plaintiff "conspicuously failed to enter any information in the rightmost column titled 'Pages, Columns, Lines where Relevant Passages or Relevant Figures Appear' even though Plaintiff knew full well the specific paragraph number of Levinson that was relevant as set forth in the PCT Written Opinion."  See Def.'s Summ. J. Opp. at 5.  Therefore, TransAct contends, "although Levinson was disclosed, there are serious questions as to whether Plaintiff violated the duty of candor required by patent applicants in securing the Asserted Patents."  Id.

The court respectfully disagrees with the argument that plaintiff's failure to provide a specific citation in Levinson is sufficient to raise a genuine dispute of material fact as to whether the examiner properly considered Levinson.  There is no dispute that the plaintiff disclosed Levinson in an Information Disclosure Statement ("IDS").  See Information Disclosure Statement, Pl.'s Ex. H, at 6 (Doc. No. 206-10).  Notably, the plaintiff also disclosed the PCT Written Opinion, see id. at 8, which explicitly cites paragraph 41 of Levinson, see PCT Opinion at 5.  No reasonable jury could conclude that the IDS constitutes "clear and convincing" evidence sufficient to overcome the presumption that the examiner considered Levinson, including the paragraph of Levinson cited in the PCT Written Opinion.

evidence upon which a reasonable jury could conclude that it has overcome this deference to the examiner.[13]

In sum, based on the totality of the evidence before the court, the court concludes that TransAct has not put forth clear and convincing evidence upon which a reasonable jury could find that the '788 Patent is invalid as obvious over the prior art. Nor has it adduced evidence to create a genuine issue of material fact as to whether the '788 Patent is obvious over the prior art. CM's Motion for Summary Judgment as to the nonobviousness of the Asserted Claims of the '788 Patent is therefore granted.

> (2)   CM's Motion for Summary Judgment of Nonobviousness of the '020 Patent Is Granted Because TransAct Has Not Put Forth Clear and Convincing Evidence upon Which a Reasonable Jury Could Find the '020 Patent Obvious over the Prior Art

CM has also moved for summary judgment as to the validity of the '020 Patent, see Pl.'s Summ. J. Mem. 12-16, which TransAct opposes, see Def.'s Summ. J. Opp. at 11.[14] CM asserts that both Patents are nonobvious over Levinson, Mobley, Kates, and Dillard, incorporating the same arguments that it used regarding the validity of the '788

---

[13] In its Opposition to CM's Motion for Summary Judgment, TransAct also contends that, because Claim 20 of the '788 Patent is "clearly invalid", and because it "slipped by the examiner", Claim 20 constitutes additional "clear and convincing evidence to overcome the presumption that the examiner considered . . . the specific relevant portions of Levinson[.]"  See Def.'s Summ. J. Opp. at 7-8.

As noted above, CM has confirmed that it is not asserting Claim 20 of the '788 Patent.  See Pl.'s Summ. J. Opp. at 31-32.  However, even assuming arguendo that the court were to conclude that Claim 20 is invalid, it would not constitute clear and convincing evidence that the examiner did not adequately consider Levinson.  The court will not assume, based on a single oversight, that an examiner has otherwise failed to adequately carry out their duties.  Indeed, the court is not aware of any Federal Circuit authority that instructs it to do so.  Thus, even if the court were to hold Claim 20 of the '788 Patent invalid, it would not materially rebut the presumption that the examiner considered Levinson.

[14] TransAct has not cross-moved for summary judgment of obviousness as to the '020 Patent. See Def.'s Summ. J. Mem.

Patent.  See Pl.'s Summ. J. Mem. at 12-16.  TransAct also appears to rely on the same obviousness arguments that it made with respect to the '788 Patent.  See Def.'s Summ. J. Opp. at 11.

Because the court has concluded that the '788 Patent is nonobvious over Levinson, Mobley, and the other prior art, and because TransAct offers no new arguments as to obviousness of the '020 Patent, the court similarly holds that TransAct has not proffered clear and convincing evidence upon which a reasonable jury could conclude that the '020 Patent is invalid as obvious over the prior art.  Nor has TransAct proffered evidence sufficient to raise a genuine issue of material fact as to whether the '020 Patent is obvious over the prior art.  Plaintiff's Motion for Summary Judgment as to the nonobviousness of the Asserted Claims of the '020 Patent is therefore granted.

2.    Infringement of the Asserted Claims of the '788 Patent and '020 Patent

TransAct moves for summary judgment of noninfringement on the grounds that none of its Accused Products directly infringe on any of the Claims in the '788 and '020 Patents.  See Def.'s Summ. J. Mot.  CM opposes that Motion.  See Pl.'s Summ. J. Opp.[15]  The court therefore reviews TransAct's Motion in the light most favorable to CM, the nonmoving party, and must take care to resolve all ambiguities in CM's favor.  See Anderson, 477 U.S. at 255.

Once a court has construed the scope and meaning of the patent claims asserted, it must then compare the "properly construed claims" to the "allegedly infringing device".  See Cyber Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed. Cir.

---

[15] CM has not cross-moved for summary judgment as to infringement of either of these Patents. See Pl.'s Summ. J. Mem.

1998), abrogated on other grounds by Teva Pharms. USA, Inc. v. Sandoz, Inc., 789 F.3d 1335 (Fed. Cir. 2015).  To prove literal infringement, a plaintiff must establish that "each and every limitation set forth in a claim appear in an accused product."  Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Intern., Inc., 389 F.3d 1370, 1378 (Fed. Cir. 2004).  "If even one limitation is missing or not met as claimed, there is no literal infringement."  Mas-Hamilton Grp. v. LaGard, Inc., 156 F.3d 1206, 1211 (Fed Cir. 1998); accord Bayer AG v. Elan Pharm. Rsch. Corp., 212 F.3d 1241, 1247 (Fed. Cir. 2000) ("If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law.").  Literal infringement is a question of fact.  See Crown Packaging Tech., Inc. v. Rexam Beverage Can Co., 559 F.3d 1308, 1312 (Fed. Cir. 2009).

Moreover, even if a patent claim is not literally infringed, it may still be infringed under the doctrine of equivalents.  The doctrine of equivalents provides that a patent claim may be infringed if the "accused product or process contain elements identical or equivalent to each claimed element of the patented invention[.]"  Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co., 520 U.S. 17, 40 (1997).  A plaintiff may prove infringement under the doctrine of equivalents by "showing on a limitation by limitation basis that the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product."  Crown, 559 F.3d at 1312.  Infringement under the doctrine of equivalents, like literal infringement, is a question of fact.  Id.

A dependent claim cannot be infringed if the independent claim on which it depends has not been infringed.  See London v. Carson Pirie Scott & Co., 946 F.2d 1534, 1539 (Fed. Cir. 1991).

           a)     '788 Patent

               (1)     There Is a Genuine Issue of Material Fact as to Whether the Accused Products Literally Infringe Claim 1 of the '788 Patent

TransAct moves for summary judgment of noninfringement as to Claim 1 of the '788 Patent—the Patent's sole asserted, independent Claim—on the grounds that no Accused Product has "a web portal application[16] executable in [a] computing device, wherein when executed the web portal application causes the . . . computing device to" both "send [a] checklist to [a] handheld computing device" and "obtain a plurality of responses to [a] checklist from [a] handheld computing device".  See Def.'s Summ. J. Mem. at 11-14 (emphasis added).  CM responds that these limitations are indeed present in the Accused Products because 'the BOHA! Control Center application satisfies the limitations of causing checklists to be sent and obtaining responses as required by Claim 1 . . . ."  See Pl.'s Summ. J. Opp. at 8.

The court notes at the outset that, in its Claim Construction Ruling, the court agreed with TransAct that the term "application causes" should be given its plain and ordinary meaning and required no further construction.  See Claim Construction Ruling at 7-9.  The court further decided that "send data . . . encoding each checklist" and its

---

[16] TransAct does state, however, that, "for purposes of its Motion, [it] does not challenge Plaintiff's contention that Defendant's BOHA! Control Center executable in a server is 'a web portal application executable in a computing device.'"  See Def.'s Summ. J. Mem. at 12.  TransAct only contends, for purposes of the Motion, that the BOHA! Control Center cannot cause the computing device to send checklists and to obtain checklist responses, and, therefore, does not meet those specific limitations of Claim 1.  See id.

related terms required no further construction.  See id. at 17-18.   The court also noted

that it would not adopt a narrower construction of the term solely to encompass "push"

technology, i.e., technology in which the request for transmission is initiated by the

sender.[17]  See id.  The court similarly decided that "obtain a plurality of responses to

each checklist" and its related terms require no further construction.  Again, the court

noted that it would not adopt a narrower construction of the term solely to encompass

"pull" technology, i.e., technology in which the request for transmission is issued by the

recipient.[18]  See id. at 18-19.  The court determined that those narrowing constructions

were unsupported by the Claim language and would contravene the Patent's

specification.  See id. at 17-19.

After reviewing the evidence proffered by both parties, the court concludes that

there is a genuine issue of material fact as to whether the BOHA! Control Central—

which, for purposes of this Motion, the parties agree, is a "web portal application

executable in a computing device"—can "cause[ ] [a] computing device" to send

checklist responses to a handheld computing device.  '788 Patent at 18:39-18:56.  The

user guide as to the BOHA! Control Center indicates that it is meant to be used and

operated from a computing device.  See BOHA! Control Center Guide at 1-2.  The

summary judgment materials submitted by TransAct state that a user can utilize the

BOHA! Control Center to create checklists, which are then "stored in the cloud and

---

[17] At the Markman hearing and in response to concerns expressed by CM, TransAct confirmed that it was not arguing that this court should construe the term "send data encoding each checklist" to solely encompass "push" technology.

[18] TransAct confirmed at the Markman hearing that it was not arguing that this court should construe the term "obtain a plurality of responses to each checklist" to solely encompass "pull" technology.

available for the employees to retrieve as desired using the BOHA! Temp app running on the BOHA! Handheld." Richtsmeier Decl. ¶ 24. CM, in turn, has proffered marketing materials from TransAct that describe how the BOHA! platform is "centrally managed from one web-based portal to <u>distribute</u> updates and monitor location performance across the country", <u>see</u> Case Study 1, Pl.'s Ex. J (Doc. No. 219-9) (emphasis added), as well as the July 27, 2021 Release Notes for BOHA! Control Center version 1.0.30.0, which states that users can use the application to monitor whether a "device has received and is using the latest Temp checklist settings and changes as configured in BOHA! Control Center", <u>see</u> Release Notes, Pl.'s Ex. M, at 4 (Doc. No. 220-6).

It is not entirely clear, from the record evidence, what the precise function is of the BOHA! Control Center and the computing device on which the BOHA! Control Center operates. For example, it is not clear what the exact process is for "stor[ing]" a configured checklist "in the cloud" and making it "available for employees to retrieve" from "the BOHA! Handheld", as described in the Richtsmeier Declaration. Richtsmeier Decl. ¶ 24. However, given the court's obligation to view the evidence in the light most favorable to CM, and to resolve all ambiguities in CM's favor, the court concludes that CM has come forward with sufficient evidence to create a genuine issue of material fact as to whether the BOHA! Control Center can "cause" a computing device to "send" checklists to a handheld computing device, within the meaning of Claim 1 of the '788 Patent. TransAct has not demonstrated that no reasonable jury could potentially find, from the record evidence—including the various materials describing how checklists are distributed from the BOHA! Control Center and received by the BOHA! Handheld and

other devices, see, e.g., Case Study 1; Release Notes—that the Accused Products more likely than not meet this limitation of Claim 1 of the '788 Patent.

There is also some evidence in the record to suggest that, once checklist responses are entered on the BOHA! Handheld, the BOHA! Control Center can "cause" a computing device to "obtain" the checklist responses.  The Declaration of Brent Richtsmeier, TransAct's Chief Technology Officer, details the following process:

> [A]fter tasks on the temperature checklist are completed (or not) and data representing that ("checklist responses") is entered into the BOHA! Temp app running on a BOHA! Handheld, the BOHA! Temp app will send the checklist responses to the BOHA! Control Center over the Internet.  The checklist responses are sent to the BOHA! Control Center by either: 1) the employee entering a specific request into the BOHA! Temp app running on a BOHA! Handheld; or 2) the BOHA! Temp app automatically sending the checklist responses at certain intervals; or 3) the BOHA! Temp app automatically sending the checklist responses when the employee logs out of the app.

Richtsmeier Decl. ¶ 25.  In addition, CM has proffered evidence of a file, obtained through discovery, that contains a "test case record" "where the 'name' tag is populated with the text 'Request Full Sync for a device from the portal'", see Test Cases, Pl.'s Ex. N (Doc. No. 219-10); Declaration of Charles M. Landrum III, at ¶¶ 16-18 (Doc. No. 219). This evidence, viewed in the light most favorable to CM, suggests that either the BOHA! Control Center or another web portal application within the Accused Products is capable of causing a computing device to obtain completed checklist responses from another device, including a handheld computing device.  As discussed above, it remains unclear how exactly the BOHA! Control Center, and the computing device in which it operates, function.  Given the court's obligation to resolve all ambiguities in CM's favor, and in light of the totality of the record evidence, the court concludes that CM has proffered evidence sufficient to raise a genuine issue of material fact as to whether the BOHA! Control Center can "cause" a computing device to "obtain" checklist responses from a

handheld computing device, within the meaning of independent Claim 1 of the '788 Patent.

The court therefore holds, in light of its claim construction and its comparison of the Asserted Patent Claim and the Accused Products, that CM has come forward with evidence that, when viewed in the light most favorable to it, could be a basis for a reasonable jury to find that the Accused Products literally infringe Claim 1 of the '788 Patent.  On the record currently before it, the court cannot grant defendant summary judgment as a matter of law.  TransAct's Motion for Summary Judgment as to Claim 1 of the '788 Patent is thus denied.

           (2)    Plaintiff Is Estopped from Asserting the Doctrine of Equivalents as to the "Application Causes . . ." Limitation in Claim 1 of the '788 Patent

TransAct asserts that CM is estopped from asserting the doctrine of equivalents as to the '788 Patent because the '788 Patent was amended and narrowed during its prosecution for patentability reasons.  See Def.'s Summ. J. Mem. at 14-15; Defendant's Reply Regarding Motion for Summary Judgment, at 6 (Doc. No. 222).  "The touchstone of prosecution history estoppel is that a patentee is unable to reclaim through the doctrine of equivalents what was surrendered or disclaimed in order to obtain the patent."  Loral Fairchild Corp. v. Sony Corp., 181 F.3d 1313, 1322 (Fed. Cir. 1999).  "[A] narrowing amendment made to satisfy a requirement of the Patent Act may give rise to an estoppel", and "[s]uch a narrowing amendment creates a presumption that the patentee surrendered the territory between the original claims and the amended claims."  See Chimie v. PPG Inds., Inc., 402 F.3d 1371, 1382 (Fed. Cir. 2005).  "In that event, prosecution history estoppel would bar the application of the doctrine of equivalents as to [the relevant] element (or claim limitation)."  Hilton Davis Chem. Co. v.

Warner-Jenkinson Co., Inc., 114 F.3d 1161, 1163 (Fed. Cir. 1997).  However, a patentee "may rebut that presumption by showing that the alleged equivalent was unforeseeable at the time the amendment was made, that the alleged equivalent was tangential to the purpose of the amendment, or that there was some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question." Chimie, 402 F.3d at 1382.

Here, it is undisputed that, according to the prosecution history of the '788 Patent, the original application Claim 1 of the '788 Patent was rejected on the grounds that (1) it was nonobvious over prior art references Mobley, Kates, and Dillard, and (2) it was too abstract.  See Decision on Appeal at 4-9.  Application Claim 4 of the Patent, which was not rejected by the USPTO and PTAB, was then rewritten and subsequently issued as Claim 1 in the final '788 Patent.  See Remarks of Request for Continued Examination of '788 Patent Application, Def.'s Ex. 6 to Cohen Decl., at 11 (Doc. 199-21); Rewritten '788 Patent Claims, Def.'s Ex. 7 to Cohen Decl., at 2-3 (Doc. No. 199-22).

Notably, the final, rewritten Claim 1 included the new limitation, "web portal application executable in [a] computing device, wherein when executed the web portal application causes [a] computing device to . . .", which was not present in the original application Claim.  Compare '788 Patent at 18:39-18:40 (including the "application causes" limitation), with Decision on Appeal at 2 (listing the original Claim 1, which does not include the "application causes" limitation).  The limitation appears to have been added for patentability reasons, i.e., in response to the PTAB's finding that application Claim 1 was nonobvious and too abstract.  See Decision on Appeal at 4-9; Rewritten

36

'788 Patent Claims at 2-3.  Indeed, as the Federal Circuit has held, "canceling a broader independent claim and replacing it with a dependent claim rewritten into independent form" constitutes a "clear surrender of the broader subject matter" that presumptively bars "application of the doctrine of equivalents."  Honeywell Intern. Inc. v. Hamilton Sundstrand Corp., 370 F.3d 1131, 1143 (Fed. Cir. 2004) (quoting Deering Precision Instruments, LLC v. Vector Distrib. Sys., Inc., 347 F.3d 1314, 1325 (Fed. Cir. 2003)); see also Hilton Davis Chem. Co., 114 F.3d at 1163 ("[W]hen a claim is amended, but the prosecution history does not reveal the reason for the change, it should be presumed that there was 'a substantial reason related to patentability for including the limiting element added by amendment.'" (quoting Hilton Davis Chem. Co., 520 U.S. at 33)).  CM has not made any attempt to rebut this presumption.  As such, the Patent authors are presumed to have "surrendered the territory between the original claims and the amended claims" in adding this limitation.  See Chimie, 402 F.3d at 1382.

The court therefore concludes that CM is estopped from asserting the doctrine of equivalents with respect to the limitation in Claim 1 reciting a "web portal application executable in [a] computing device, wherein when executed the web portal application causes [a] computing device to . . . ."  Thus, if a jury determines that TransAct has not literally infringed this limitation of Claim 1, CM may not argue that the limitation is nonetheless infringed under the doctrine of equivalents.

        b)    '020 Patent

            (1)    The Accused Products Do Not Literally Infringe
                        Claims 1, 15, and 20 of the '020 Patent

TransAct similarly moves for summary judgment of noninfringement as to independent Claims 1, 15, and 20 of the '020 Patent.  See Def.'s Summ. J. Mem at 15-

23.  Because the defendant relies on the same, dispositive argument for all three

independent Claims, see id., the court will analyze these Claims together.

As a threshold matter, TransAct relies on virtually the same arguments in the

'788 Patent as it does for the '020 Patent.  Although TransAct does not dispute, for

purposes of this Motion, that the BOHA! Control Center constitutes a "management

portal application", which this court has construed to mean "portal application that

provides an interface for management users to manage checklists", see Claim

Construction Ruling at 11-14, TransAct argues that such an application cannot, when

executed, cause a computing device to send checklists to a handheld computing device

and to obtain checklist responses from a handheld computing device.  See Def.'s

Summ. J. Mem. at 15-23.  As discussed above, see Section IV.A.2.a.1, supra, CM has

proffered evidence sufficient to raise a triable issue of fact as to whether these

limitations have been met; because TransAct relies on the same arguments, this

dispute of material fact similarly exists with respect to Claims 1 and 20[19] of the '020

Patent.

However, TransAct's noninfringement Motion as to the '020 Patent has an

additional argument.  TransAct also contends that none of its Accused Products allow

for "temperature data . . . wirelessly communicated from the at least one stationary

sensor to the handheld computing device."  See Def.'s Summ. J. Mem. at 17-23.  The

court notes, at the outset, that during claim construction, it declined to further construe

the term "wirelessly communicated from the at least one stationary sensor to the

---

[19] Claim 20 of the '020 Patent uses the term "instructions" in place of "management portal application", but it otherwise contains the same limitation as Claim 1.  See '020 Patent at 22:22-22:26. Claim 15, however, does not contain the "application causes . . ." limitation.  See id. at 21:12-21:53.

handheld computing device", finding that the plain and ordinary meaning of the term was clear on its face.  See Claim Construction Ruling at 27-29.  In so doing, the court explicitly rejected CM's proposed construction of "transmitted from the stationary sensor to the handheld computing device, where at least part of the data transmission is performed wirelessly".  Id.  The court held that this proposed construction—which allowed for communication from the stationary sensor to the handheld computing device that was only partially wireless and, therefore, partially wired—directly contravened the plain meaning of the claim term.  See id.

Having reviewed the briefing and the record, the court concludes that CM has failed to provide any evidence that any of the defendant's Accused Products include stationary sensors that wirelessly communicate temperature data to a handheld computing device.  Indeed, TransAct asserts that its stationary sensors are incapable of wireless communication with its BOHA! Handheld.  See Richtsmeier Decl. ¶ 22 (attesting that "TransAct's BOHA! Sensors cannot communicate temperature data to the BOHA! Handheld because the BOHA! Sensors communicate temperature data by only LoRaWAN", that the "BOHA! Handheld does not have the chipset to communicate by LoRaWAN", and that the BOHA! Sensors can only wirelessly communicate the data to the "BOHA! Gateway [which is] is a router specifically designed to receive data by LoRaWAN"); accord BOHA! Sense User Guide, Def.'s Ex. 4 to Richtsmeier Decl., at 3 (Doc. No. 199-7) (stating that "LoRa is the network that sends data from the [BOHA!] sensors to the [BOHA!] [G]ateway"); Deposition of Brent Richtsmeier ("Richtsmeier Dep."), Pl.'s Ex. E, at 124:20-125:17 (Doc. No. 220-2) (describing LoRaWAN communication between BOHA! Sensors and the BOHA! Gateway).  CM has proffered

no evidence to materially challenge that assertion.[20]  Rather, CM contends that the Accused Products meet this limitation because, "while the temperature data may take one or more intermediate steps and/or be communicated through one or more pieces of intervening equipment, as one of ordinary skill in the art would understand, the data collected by the sensor ultimately appears on applications within the handheld computing device" after being automatically recorded in data logs.  See Pl.'s Summ. J. Opp. at 20.  This argument is unavailing.  As CM itself appears to concede in its Opposition, the transmittal of temperature data from the BOHA! Sensors to the BOHA! Handheld device requires the use of wires and intermediate devices.  See id. ("Transact implicitly construes this claim phrase as requiring 100% wireless communication between points A and B.  However, there is nothing in the patents-in-suit that requires such a narrow restriction, as one of ordinary skill in the art would know and understand the patents-in-suit to convey that at least one portion of such communication may be wireless, with one or more additional portions not being wireless.").  As noted above, the court has already rejected any proposed construction of "wirelessly communicated from the at least one stationary sensor to the handheld computing device" in which "one or more . . . portions" of said communication are "not . . . wireless".  Id.; see Claim Construction Ruling at 27-29.

---

[20] Indeed, the evidence proffered by CM—and the arguments it makes as to literal infringement—appear to affirm, rather than dispute, TransAct's description of how the BOHA! Sensors, BOHA! Handheld, and BOHA! Gateway function.  See, e.g., Pl.'s Summ. J. Opp. at 19-20 (citing TransAct's attestations that "BOHA! Sensors communicate temperature data only by LoRaWAN" in support of the proposition that "there is no dispute that temperature data is transmitted wirelessly from the BOHA! Sensors"); Richtsmeier Dep. at 124:20-125:17 (describing LoRaWAN communication between BOHA! Sensors and the BOHA! Gateway).  Instead, CM argues that the functionality of these Products comes within the meaning of the claim term "wirelessly communicated from [a] stationary sensor to the handheld computing device".  See Pl.'s Summ. J. Opp. at 19-21.

Because CM's sole theory of literal infringement as to this limitation—i.e., partially wired, partially wireless communication—directly contravenes this court's claim construction—i.e., wireless communication—it cannot be accepted.  Even viewing the evidence in the light most favorable to CM and resolving all ambiguities in its favor, it is clear to this court that no reasonable jury could conclude, pursuant to CM's theory of infringement, that the Accused Products literally infringe the "wirelessly communicated from the at least one stationary sensor to the handheld computing device" limitation of Claims 1, 15, and 20 of the '020 Patent, within the meaning of this court's construction.

The court therefore concludes, based on its claim construction and the undisputed evidence before the court, that the claim limitation "temperature data . . . wirelessly communicated from the at least one stationary sensor to the handheld computing device" is absent from the defendant's Accused Products.  Where "a claim limitation is absent from the accused device[s], there is no literal infringement as a matter of law."  Bayer AG, 212 F.3d at 1247.  The defendant's Motion for Summary Judgment on the grounds that independent Claims 1, 15, and 20 of the '020 Patent are not literally infringed is therefore granted.

(2)    Plaintiff Is Estopped from Asserting the Doctrine of Equivalents as to Claims 1, 15, and 20 of the '020 Patent

TransAct similarly argues that CM is estopped from asserting the doctrine of equivalents as to Claims 1, 15, and 20 of the '020 Patent due to narrowing amendments that were added during the Patent's prosecution history.  See Def.'s Summ. J. Mem. at 20-24.

The parties do not dispute that, during the prosecution history, the application Claims of the '020 Patent were rejected by the USPTO under 35 U.S.C. § 101 as being

41

directed to a judicial exception, i.e., non-statutory subject matter.  See Remarks of Request for Continued Examination of '020 Patent Application ("'020 Patent Application Remarks"), Def.'s Ex. 11 to Cohen Decl., at 12-13 (Doc. No. 199-26).  In response, the applicants amended the claims to include the limitation that temperature data is "wirelessly communicated from the at least one stationary sensor to the handheld computing device".  See Request for Continued Examination at 3, 7-8, 10-11; '020 Patent Application Remarks at 14 ("Further, claim 20 has been amended to recite 'temperature data automatically measured by at least one stationary sensor and wirelessly communicated from the at least one stationary sensor to the handheld computing device,' which by taking place automatically and wirelessly does not require human activity.").  The amended application Claims were ultimately issued as Claims 1, 15 and 20 of the '020 Patent.  See Rewritten '020 Patent Claims; '020 Patent.

Estoppel as to the doctrine of equivalents generally "arises when an amendment is made to secure the patent and the amendment narrows the patent's scope."  Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 535 U.S. 722, 736 (2002).  As the Supreme Court has held, "[a] narrowing amendment made to satisfy any requirement of the Patent Act may give rise to an estoppel".  Id.  Here, the record makes clear, and the parties do not dispute, see Pl.'s LR 56(a)2 Stmt. ¶ 16, that the limitation "wirelessly communicated from the at least one stationary sensor to the handheld computing device" was added for patentability reasons.  See Remarks for Application Number 15/804,483 at 14.  CM has made no attempt to rebut the presumption that estoppel applies to this limitation.

The court thus holds that CM is estopped from asserting the doctrine of equivalents with respect to the limitation "wirelessly communicated from the at least one stationary sensor to the handheld computing device" in Claims 1, 15, and 20 of the '020 Patent. Because the court has concluded that none of the defendant's Accused Products literally infringe this limitation of Claims 1, 15, and 20, and because the doctrine of equivalents cannot be asserted with respect to this limitation, CM's infringement claims with respect to the independent Claims of the '020 Patent must fail. In turn, because a dependent claim cannot be infringed if the independent claim on which it depends has not been infringed, see London, 946 F.2d at 1539, the court holds that the other asserted Claims of the '020 Patent have also not been infringed by TransAct's Accused Products. The defendant's Motion for Summary Judgment of noninfringement as to the Asserted Claims of the '020 Patent is therefore granted.

c)      "Non-Temp Accused Products"

In addition, TransAct asserts, in its Motion for Summary Judgment, that most of its other Accused Products cannot infringe the independent Claims of any of the three Asserted Patents because "all Asserted Independent Claims require 'temperature data' measured by a 'stationary sensor' and none of [these products] involve temperature data or a stationary sensor." See Def.'s Summ. J. Mem. at 10; see also note 7, supra (listing products that, according to TransAct, do not involve temperature data). TransAct refers to these products as "Non-Temp Accused Products". See id.

CM, however, disputes TransAct's broad assertion that these "Non-Temp Accused Products" "do not involve" temperature data and has proffered evidence that temperature data is, indeed, accessible and viewable via the BOHA! Ops application,

"which is available on" the BOHA! Terminal and BOHA! Workstation, both of which

TransAct has deemed to be "Non-Temp Accused Products". See Plaintiff's Transcript

of the Deposition of Jessica Pagonis, Pl.'s Ex. L, at 249:2-249:9; 211:1-211:11 (Doc.

No. 207-5).[21]

Given that it remains disputed and unclear as to whether at least some of these

Products have some connection to the collecting or recording of temperature data, the

court cannot rule, at this juncture, that "none of the Asserted Independent Claims can

be literally infringed by any actions involving any Non-Temp Accused Product", as

defendant requests.  Therefore, to the extent that TransAct seeks such a determination

from this court in its Motion for Summary Judgment, that request is denied.

B.    Motions to Seal

In relation to their Motions for Summary Judgment, the parties have also moved

to seal various documents.  The court now addresses each Motion in turn.

As a threshold matter, the court notes that it will generally grant motions to seal

or redact portions of documents upon a showing that they contain confidential or

proprietary business information.  However, when a document is cited, and relied upon,

by this court in its Ruling, it is this court's view that the public's interest in understanding

the bases of the court's Ruling generally outweighs the parties' interest, and therefore,

the cited portions should remain unredacted and available on the public docket.

Accordingly, defendant's Motion to Seal (Doc. No. 201) Exhibit 19 is granted,

because the document is not cited in this court's Ruling and, upon review, it is clear to

--------------------------------------------------

[21] Although CM filed this deposition transcript as part of its own Motion for Summary Judgment, it also cites to this deposition in its Local Rule 56(a)2 Statement in opposition to TransAct's Motion for Summary Judgment.  See Pl.'s L.R. 56(a)2 Stmt. ¶ 37.

this court that there is confidential and proprietary business information throughout the Exhibit.

Plaintiff's Motion to Seal (Doc. No. 208) its unredacted Memorandum of Law in Support of its Motion for Summary Judgment, its unredacted Local Rule 56(a)1 Statement, and various exhibits, is granted in part and denied in part.  The court notes that CM has filed redacted versions of its Motion for Summary Judgment and Local Rule 56(a)1 Statement.  See Redacted Brief in Support of Plaintiff's Motion for Summary Judgment on Validity and Infringement (Doc. No. 206-1); Plaintiff's Redacted Local Rule 56(a)1 Statement (Doc. No. 206-2).  It does not appear that any of the redacted portions of these materials were cited in this court's Ruling.  It also appears that the redactions are, indeed, limited to confidential and propriety business information.  However, CM requests that the court seal certain Exhibits in their entirety, see Motion to Seal (Doc. No. 208), one of which was cited in this court's Ruling, see Plaintiff's Transcript of the Deposition of Jessica Pagonis, Pl.'s Ex. L (Doc. No. 207-5).  Given this court's view that any portions of documents that are cited in this court's Ruling should be available to the public, plaintiff is ordered to refile, within fourteen days from the date of this Ruling, a redacted version of Exhibit L, the Pagonis Deposition, with the portions of the Deposition that are cited in this court's Ruling unredacted.  If plaintiff fails to file these documents within fourteen days, the unredacted versions will be unsealed.

Defendant's Motion to Seal (Doc. No. 213) its unredacted Local Rule 56(a)2 Statement is granted because the redactions in the redacted version filed by TransAct, see Defendant's Redacted Local Rule 56(a)2 Statement (Doc. No. 212-1), are limited to

confidential and proprietary business information and it appears, to this court, that none of the redacted portions are cited in this court's Ruling.

Plaintiff's Motion to Seal (Doc. No. 221) its unredacted Opposition Memorandum to defendant's Motion for Summary Judgment, its unredacted Local Rule 56(a)2 Statement, and various Exhibits, is similarly granted in part and denied in part.  Because certain, redacted portions of these documents are cited in this court's Ruling—see, e.g., Pl.'s LR 56(a)2 Stmt. ¶¶ 42-43; Deposition of Brent Richtsmeier, Pl.'s Ex. E (Doc. No. 220-2); Release Notes, Pl.'s Ex. M (Doc. No. 220-6)—the court declines to grant plaintiff's Motion to Seal in full.  Accordingly, plaintiff is ordered to refile, within fourteen days from the date of this Ruling, redacted versions of the documents, with the portions of the documents that have been cited in this court's Ruling unredacted.  If plaintiff fails to file these documents within fourteen days, the unredacted versions will be unsealed.

Finally, plaintiff's Motion to Seal (Doc. No. 228) its unredacted Reply Memorandum as to its Motion for Summary Judgment, and the two exhibits attached thereto, is granted, given that none of the aforementioned documents were cited in this court's Ruling.

## V.   CONCLUSION

For the reasons stated above, the defendant's Motion for Summary Judgment (Doc. No. 199) is granted in part and denied in part; and plaintiff's Motion for Summary Judgment (Doc. No. 206) is granted in part and denied in part.

The court grants defendant's Motion as to noninfringement, either literally or under the doctrine of equivalents, of the Asserted Claims of the '020 Patent, and denies defendant's Motion as to noninfringement of the Asserted Claims of the '788 Patent.

46

The court also grants defendant's Motion to estop plaintiff from asserting the doctrine of equivalents with respect to the "application causes . . ." limitation in Claim 1 of the '788 Patent.  Defendant's Motion as to the obviousness of the '788 Patent is denied.

Plaintiff's Motion as to the nonobviousness of the Asserted Claims of the '788 and '020 Patents is granted.  Plaintiff's Motion as to the validity of the '788 and '020 Patents is granted with respect to the definiteness of the terms "time interval has not been completed", "future temperature data and future food temperature data", "data encoding each checklist", "data encoding the checklist", and "management portal application"; the Motion is also granted as to CM's argument that "management portal application" complies with the written description requirement.  The Motion is denied with respect to whether Claim 19 of the '788 Patent and the term "data encoding each checklist" comply with the written description requirement.

The portions of plaintiff and defendant's Motions that pertain to the '810 Patent are terminated as moot.  The court will rule on the validity (or invalidity) and infringement (or noninfringement) of the '810 Patent after plaintiff and defendant's respective, renewed Motions for Summary Judgment as to the '810 Patent have been joined.

**SO ORDERED.**

Dated at New Haven, Connecticut this 27th day of February 2024.

 /s/ Janet C. Hall

Janet C. Hall
United States District Judge

47